**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY.**

**Southeastern Pennsylvania Transportation Authority ("SEPTA"), Appellant in No. 90–1676.**

**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY.**

**Consolidated Rail Corporation, Appellant in No. 90–1677.**

**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY.**

**United States of America, Appellant in No. 90–1678.**

**Nos. 90–1676 to 90–1678.**

United States Court of Appeals, Third Circuit.

Argued May 6, 1991.

Decided Sept. 19, 1991.

Joseph A. Dworetzky, (argued), Drinker, Biddle & Reath, (James F. Kilcur, Gen. Counsel, Southeastern Pennsylvania Transp. Authority, of counsel), Philadelphia, Pa., for Southeastern Pennsylvania Transp. Authority, appellant No. 90–1676.

David Richman, Pepper, Hamilton & Scheetz, Ralph G. Wellington (argued), Rodney B. Griffith, and Margaret S. Woodruff, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Consol. Rail Corp., appellant No. 90–1677.

Richard B. Stewart (argued), Asst. Atty. Gen., Michael M. Baylson, U.S. Atty., Catherine Votaw, Asst. U.S. Atty. Philadelphia, Pa., and Vicki Plaut, Joel M. Gross, and Dirk Snel, Attys. U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., (John H. Wheeler, David A. Rabbino, and Jon Averback, E.P.A., of counsel), Environmental Protection Agency for the U.S., appellant No. 90–1678.

Kenneth N. Hart (argued), James J. Capra, Alan B. Howard, Donovan, Leisure, Newton & Irvine, New York City and Robert J. Siverd, and Michael L. Cioffi, Penn Cent. Corp., Philadelphia, Pa., for appellee.

Before MANSMANN, NYGAARD and RONEY,* Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal arising out of the complicated and protracted Penn Central Transportation Company ("PCTC") bankruptcy proceedings, we are presented with the issue of whether the United States, Southeastern Pennsylvania Transportation Authority ("SEPTA") and Consolidated Rail Corporation ("Conrail") are precluded by the district court's Consummation Order and Final Decree from seeking recovery for hazardous waste clean-up costs under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.*, from the reorganized company, Penn Central Corporation ("PCC"), after the consummation of those proceedings. The district court found that the United States, SEPTA and Conrail were precluded from bringing their CERCLA claims, and thus denied their petitions seeking leave to sue PCC.

We conclude that the district court erred as a matter of law and that the petitioners *are* entitled to bring their CERCLA claims against PCC because (1) the CERCLA claims were not discharged by the consummation order because the claims were not

then in existence and (2) a legal entity still exists against which claims may be asserted because the restructuring of PCTC into PCC under section 77 of the Bankruptcy Act of 1898, formerly codified at 11 U.S.C. § 205 (repealed 1978), was not a "liquidation type" reorganization. Our jurisdiction is based upon 28 U.S.C. § 1291 and section 24(a) of the Bankruptcy Act, 11 U.S.C. § 47 (repealed 1978).

## I.

PCTC and its corporate predecessor, the Pennsylvania Railroad Company, had owned and operated the Paoli Yard from approximately 1915 through 1976. At the time PCTC filed for reorganization under Section 77 of the Bankruptcy Act on June 27, 1970, polychlorinated biphenyls ("PCBs") had been used at the Paoli Yard for over thirty years. For the next six years, the PCTC Trustees owned and operated the Paoli Yard, and continued to use PCBs on the property.

On April 1, 1976, pursuant to the Final System Plan established under the Regional Rail Reorganization Act of 1973, *see* 45 U.S.C. §§ 716–18, PCTC's Trustees conveyed the Paoli Yard to Conrail; Conrail immediately reconveyed it to the National Railroad Passenger Corporation ("Amtrak"), which has remained its owner until the present time. On that same day, Conrail commenced the operation of a commuter service for SEPTA within the Delaware Valley area, using railroad facilities that included the Paoli Yard.

Two years later, on October 24, 1978 (the "Consummation Date"), the reorganization of PCTC which had begun in 1970 culminated in the district court's issuance of a Consummation Order and Final Decree, which precluded, *inter alia*, future lawsuits against the reorganized debtor, PCC, "on account of or based upon any right, claim or interest of any kind or nature whatsoever which any such person ... may have in, to or against any of the Debtors, the Trustees of the Properties of the Debtors or any

---

* Honorable Paul H. Roney of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

of their assets or properties." Consummation Order and Final Decree, ¶ 7.02 (August 17, 1978). But in 1980 Congress passed CERCLA, which imposed retroactive liability on both present and past owners of facilities where hazardous substances, including PCBs, are being or have been released and it is the passage of this statute which forms the crux of these appeals.[1] During these same years, from 1976 through the early 1980's, we note that Conrail continued to provide commuter service for SEPTA until Congress relieved Conrail of that obligation, effective January 1, 1983, in the Northeast Rail Services Act of 1981, 45 U.S.C. § 744a. SEPTA then began to operate its own commuter service and Conrail discontinued its use of the Paoli Yard.

It was in 1986 that a series of lawsuits was filed in the United States District Court for the Eastern District of Pennsylvania against Conrail, SEPTA, and Amtrak. The suits, including one filed by the United States on behalf of the Environmental Protection Agency, alleged that Conrail, SEPTA and Amtrak had been responsible for the release of PCBs into the environment at the Paoli Yard and in the adjacent residential community since April 1, 1976. Pursuant to CERCLA, the United States sued Conrail, SEPTA, and Amtrak to clean up PCB contamination at the Paoli Yard because of their alleged ownership or operation of the Paoli Yard since April 1, 1976.[2] The United States requested mandatory injunctive relief to remedy PCB contamination and reimbursement of the government's cleanup and related costs.

In June of 1986, Conrail petitioned the United States District Court for the Eastern District of Pennsylvania, which had retained jurisdiction to consider such petitions under its equitable power, for leave to implead PCC in the Paoli PCB cases so that it could assert claims under CERCLA for contribution and indemnity. SEPTA also petitioned for leave to file third-party claims against PCC, and the United States asked for permission to file direct claims against PCC.

On January 14, 1988, the district court issued Memorandum and Order 4311, which resolved many of the issues that had been raised. The district court permitted claims involving direct personal injury and property damage to be brought against PCC and allowed SEPTA and Conrail to pursue third-party claims to the extent that those claims arose out of the personal injury and property damage suits. Additionally, the district court invited briefing on the relevance of the decision of the United States Court of Appeals for the Sixth Circuit entitled, *In re Erie Lackawanna Ry. Co.*, 803 F.2d 881 (6th Cir.1986).

On August 8, 1990, the district court issued Memorandum and Order 4331, finding that its Consummation Order and relevant principles of bankruptcy law precluded Conrail, SEPTA and the United States from asserting claims under CERCLA against PCC after the Consummation Date. In reaching its decision, the district court stated that it would require an unduly broad reading of our decision in *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936 (3d Cir.1985)—one that it would not undertake—in order to permit the petitioners to proceed against PCC under CERCLA despite PCTC's final discharge in bankruptcy. In addition, the district court viewed the PCTC Reorganization Plan as a "liquidation type" reorganization and, following the reasoning of the court in *Erie Lackawanna*, found that PCC could not be held liable for any claims not listed in the Amended Plan of Reorganization. Because the issues on appeal involve questions of law, we exercise plenary review.

## II.

We begin with the general proposition that in the context of bankruptcy "the need

---

1. The parties do not dispute the fact that Congress intended CERCLA to have retroactive effect. *See, United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 732–33 (8th Cir.1986).

2. The United States filed its suit because the EPA had determined that the presence of the PCBs at the Paoli Yard presented an imminent and substantial endangerment to the public health or the environment.

for finality and certainty is especially acute." *Taylor v. Freeland & Kronz,* 938 F.2d 420, 425 (3d Cir.1991) (*citing Chrysler Motors Corp. v. Schneiderman,* 940 F.2d 911, 914 (3d Cir.1991)). Nevertheless, despite the fact that the Consummation Order has been entered in the PCTC bankruptcy proceedings, the petitioners urge us to permit them to sue PCC—i.e., to assert claims now against PCC—years after PCTC's discharge in bankruptcy based upon an "exception" to finality which we carved out in *Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936 (3d Cir.1985). The issue that we addressed in *Schweitzer* was "whether a plaintiff in an asbestos-related personal injury action who had no manifest injury prior to the consummation date of his employer's reorganization in bankruptcy had a dischargeable 'claim' within the meaning of section 77" of the Bankruptcy Act. *Id.* at 939. There, railroad employees brought personal injury claims against the reorganized railroad under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* (1982), subsequent to the relevant consummation dates of the debtor company. The employees alleged that because their asbestos-related injuries did not become manifest until after the consummation dates, their claims had not been discharged in the bankruptcy proceedings.

In addressing this issue, we first sought to determine whether the employees had "claims" against their employer under the FELA prior to the consummation dates. *Id.* at 941. We reasoned that for the employees to have had tort causes of action prior to the consummation dates, they would have had to have suffered identifiable, compensable injuries prior to the relevant consummation dates. *Id.* at 942. Under the circumstances presented, we concluded that the subclinical injury resulting from exposure to asbestos was insufficient to constitute the requisite loss or damage to sustain a tort cause of action. *Id.* Therefore, the employees did not have "claims" under the FELA *before* the consummation dates.

We next considered whether the employees had "contingent" claims that they could have asserted against the debtor prior to the consummation dates. We stated that "before one can have an 'interest' which is cognizable as a contingent claim under section 77, one must have a legal relationship relevant to the purported interest from which that interest may flow." *Id.* at 943. Consequently, because no compensable tort arose under the FELA until the manifestation of an injury, the employees and the employer railroad had "no legal relationship relevant to the plaintiffs' future causes of action in tort from which an 'interest' could flow." *Id.* Moreover, it would be "absurd," we concluded, to expect the plaintiffs, who had not manifested an injury at the time of reorganization, to file claims in the reorganization proceedings. *Id.* Therefore, we held that the plaintiffs' FELA causes of action were not dischargeable claims under section 77.

Our analysis in *Schweitzer* is particularly relevant to the facts before us here. On October 24, 1978, the reorganization of PCTC was consummated and the injunction against the filing of future lawsuits "based upon any right, claim or interest ... whatsoever ... in ... the Properties of the Debtors" was entered. We note, however, that at the moment of the bankruptcy discharge and the inception of the injunction, CERCLA had not yet been passed by Congress. Indeed CERCLA was not enacted until 1980. Consequently, at the time of the Consummation Order, there was no statutory basis for liability to be asserted against PCTC by the petitioners. Just as the employees in *Schweitzer* had no recognizable tort causes of action under the FELA prior to the employer railroad's relevant consummation dates, the petitioners here could not have brought claims under CERCLA prior to the Consummation Date.

Furthermore, the petitioners did not have "contingent" claims prior to the Consummation Date. In *Schweitzer,* we decided that because no tort claims arose under the FELA until the manifestation of injury, "there was no legal relationship between plaintiffs and defendants relevant to plaintiffs' future causes of action in tort from which an 'interest' could flow." *Id.* at 943. Under the facts now before us in this ap-

peal, it was not until the passage of CERCLA that a legal relationship was created between the petitioners and PCC relevant to the petitioners' potential causes of action such that an interest could flow. Because this legal relationship did not evolve until after the Consummation Date, the petitioners did not have contingent claims against PCTC. Accordingly, our decision in *Schweitzer* leads us to the conclusion that the petitioners' asserted claims under CERCLA did not constitute dischargeable claims within the meaning of section 77 and thus survive the discharge of the debtor.

PCC argues that our analysis in the related case of *In re Penn Central Trans. Co.*, 771 F.2d 762 (3d Cir.1985) (*"Pinney Dock"*), mandates the preclusion of the petitioners' claims. In *Pinney Dock*, a party was refused permission to pursue an antitrust claim against PCC for alleged violations committed by PCTC before the bankruptcy proceedings but apparently not discovered by the putative claimant until after the reorganization had been consummated. We find that *Pinney Dock*, in fact, supports our conclusion that the petitioners did not have claims before the Consummation Date. The difference between *Pinney Dock* and the appeal before us is simply that in *Pinney Dock* all of the factual and legal elements of the plaintiff's claim existed prior to the consummation of the PCTC bankruptcy. Here, because CERCLA had not yet been enacted, the petitioners lacked this cause of action against PCTC prior to the Consummation Date. Consequently, unlike the antitrust claims sought to be asserted in *Pinney Dock*, the petitioners' CERCLA claims against PCC here could not have been discharged in the PCTC bankruptcy proceedings.

Nonetheless, *Schweitzer* does not answer the question of which party, the original debtor (PCTC) or its successor (the reorganized company PCC), should bear the loss if liability is ultimately imposed. Although we decided in *Schweitzer* that the railroad employees' FELA claims were not discharged in the bankruptcy proceedings, it was not until *Zulkowski v. Consolidated Rail Corp.*, 852 F.2d 73 (3d Cir.1988), that we identified which entity would be liable if the claims proved to be meritorious. In *Zulkowski*, we held that such liability would remain with the reorganized company. Accordingly, because the petitioners' claims under CERCLA were not discharged in the PCTC bankruptcy proceedings, the petitioners may bring their post-consummation claims against PCC, and if their claims prove to be meritorious, PCC will bear the CERCLA costs.

### III.

In further support of its decision to prohibit the petitioners from bringing their claims under CERCLA against PCC, the district court determined, citing *In re Erie Lackawanna Ry. Co.*, 803 F.2d 881 (6th Cir.1986), that the PCTC Reorganization Plan was more akin to a liquidation than a reorganization and that no culpable legal entity remained. Because we find that the facts in *Erie Lackawanna* are clearly distinguishable from those before us, we decline to reach the issue of whether *Erie Lackawanna* was decided correctly. *See Zulkowski*, 852 F.2d at 79 n. 8. Instead we emphasize, without endorsing or rejecting the decision in *Erie Lackawanna*, that that case involved a rather anomalous fact pattern not susceptible to ready application.

In *Erie Lackawanna*, the plaintiffs brought asbestos-related personal injury actions against a company that had been reorganized under the Bankruptcy Act. As in *Schweitzer*, their injuries did not manifest themselves until after the reorganization had been consummated. Because of the peculiar facts in *Erie Lackawanna*, however, the court then sought to determine whether the restructuring under the Bankruptcy Act was more in the nature of a liquidation than of a reorganization. The court reasoned that if the restructuring was in reality more similar to a liquidation, no legal entity would remain in existence against which an action could be brought.

When analyzing the case, the court considered the unique facts surrounding the Erie Lackawanna bankruptcy proceedings. Describing the bankruptcy proceeding as a "liquidating plan of reorganization," *Erie Lackawanna*, 803 F.2d at 882, the court

quoted from the plan of reorganization: "[t]he general program of activities to be carried on by the Reorganized Company will be to liquidate its remaining assets as expeditiously as practicable." The stated purpose of the bankruptcy was to bring to closure all operations and to dispose of all assets of the company unless 75 percent of the shareholders voted to the contrary. In addition, Erie Lackawanna Inc.'s sole stock holder received nothing under its bankruptcy plan and when Erie Lackawanna Inc. received the proceeds of its valuation case settlement, it was insolvent. Further, in large part, Erie Lackawanna Inc.'s rail assets were conveyed to Conrail and it was only permitted to manage Erie Lackawanna Railway's assets held in a master trust for the benefit of creditors of the Erie Lackawanna Railway. Therefore, based upon these facts, the court determined that the proceedings more closely resembled a liquidation and held that the claims were discharged and warranted the enjoinder of the prosecution of such claims.

Our task then is to determine whether the reorganization here was in the nature of a liquidation such that PCC should not have liability for PCTC's actions. We begin with the Amended Plan of Reorganization which provided:

> For the purposes of convenience, simplicity and economy in carrying out the Plan and of continuity in the operations of the Debtor [PCTC], the determination has been made *to continue the existence* of the Debtor and to seek to vest in the Debtor ownership or control of the assets or stock of the Secondary Debtors and certain other Leased Lines. It is intended for federal income tax purposes that *the present consolidated group will continue in existence*, with the reorganized Penn Central Transportation Company as the parent company.

(Emphasis added.) The PCTC plan does not provide for PCC's liquidation. In fact, PCC's post-bankruptcy history of acquisitions and long-term growth is completely inconsistent in any way with liquidation: PCC's assets are not held in trust and it continues to engage in a variety of ongoing business operations. PCTC's sole stockholder received ten percent of the new PCC stock issued pursuant to the reorganization plan and when PCC received approximately $2.1 billion in settlement of its valuation case, PCC was able to redeem all outstanding reorganization securities and to increase its common shareholder's equity by approximately $485 million.

Finally, PCTC explicitly represented to the IRS, under oath, that it had no plan or intention to liquidate. Priv.Ltr.Rul. 7828062 (April 14, 1978). Such a representation was needed for PCC to ensure the preservation of its net operating loss carryovers. Consequently, PCC should not now be permitted to claim that its bankruptcy proceeding was more in the nature of a liquidation than a reorganization.

This issue of whether a reorganization more closely resembles a liquidation or a reorganization also arose in *Zulkowski*. There we concluded that the restructuring of CJI Industries, Inc., was not a "liquidation type" reorganization. We are struck by the many similarities between CJI and PCC. For example, despite the fact that both companies changed their names upon consummation of the bankruptcy proceedings, both continued to acknowledge their links to the railroad companies. Both companies conveyed their railroad assets to Conrail, but retained all other assets. Most importantly, although both companies had conveyed their rail operations, they retained substantial income tax loss carry-forwards relating to the railroads. Thus, on such very similar facts, *Zulkowski* also leads us to conclude that PCC should not be relieved of liability for claims based upon the assertion that its restructuring under the Bankruptcy Act was of a "liquidation type."

## IV.

Having determined that the petitioners are entitled to bring their CERCLA claims against PCC, we need not reach the petitioners' due process claim. We will reverse the order of the district court and remand with instructions that the petitioners be

permitted to bring their CERCLA claims against PCC.