**In the Matter of CMC HEARTLAND PARTNERS, Debtor.**

No. 91–3005.

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1992.

Decided July 2, 1992.

Daniel R. Murray, Michael T. Brody, Jerold S. Solovy, Barry Sullivan (argued), Robert L. Graham, Jenner & Block, Chicago, Ill., for appellant.

Fred Foreman, U.S. Atty., Criminal Div., Chicago, Ill., Lee M. Thomas, Lawrence J. Jensen, Earl Salo, E.P.A., Washington, D.C., Valdas V. Adamkus, Robert B. Schaefer, Thomas J. Kenney, E.P.A., Region 5, Office of the Regional Counsel, Chicago, Ill., E. Donald Elliott, E.P.A., Washington, D.C., for appellee E.P.A.

Fred Foreman, U.S. Atty., Joel R. Nathan, Asst. U.S. Atty., Civil Div., Appellate Section, Chicago, Ill., David C. Shilton, Dirk D. Snel (argued), Dept. of Justice, Land & Natural Resources Div., Joel M. Gross, Barbara Rogers, Glen Freyer, Dept. of Justice, Environmental Defense Section, Richard B. Stewart, Dept. of Justice, Land & Natural Resources Div. Washington, D.C., for appellee U.S.

Arthur A. Vogel, Jr., William H. Harbeck (argued), Quarles & Brady, Milwaukee, Wis., Roy L. Prange, Quarles & Brady, Madison, Wis., for intervenor-appellee General Motors Corp.

Before EASTERBROOK and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Competition from trucks combined with onerous regulation got the better of the fabled Milwaukee Road during the 1970s. In 1977 the Chicago, Milwaukee, St. Paul & Pacific Railroad filed a petition under § 77 of the Bankruptcy Act of 1898. After

abandoning losing spurs, it sold some operations to short lines and the rest to the Soo Line. E.g., *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 830 F.2d 758 (7th Cir.1987); *In re Chicago, M., St. P. & P. R.R.*, 827 F.2d 112 (7th Cir.1987); *In re Chicago, M., St. P. & P. R.R.*, 799 F.2d 317 (7th Cir.1986); *In re Chicago, M., St. P. & P. R.R.*, 789 F.2d 1281 (7th Cir.1986); *In re Chicago, M., St. P. & P. R.R.*, 784 F.2d 831 (7th Cir.1986). The sales, coupled with its vast real estate holdings, enabled the Milwaukee Road to pay every creditor in full and emerge as a flourishing business—but no longer a railroad. CMC Heartland Partners is the latest incarnation of the firm, entitled to all benefits of the plan of reorganization and terminal injunction against the railroad's creditors.

Today's case has aspects of the old railroad's transportation and real estate businesses, with an overlay of bankruptcy. The Milwaukee Road mined some of the gravel it needed for roadbeds from a site near Janesville, Wisconsin. Having created a gaping hole in what came to be called Wheeler Pit, the Milwaukee Road agreed to let General Motors Corporation help fill it up again. In 1956 the railroad leased 3.82 acres of the Pit to GM, which it used until 1974 to dump paint sludge and coal ash generated by its plant nearby. Today there is no pit; grass and trees cover the site. When closing and sealing its corner of Wheeler Pit, GM followed the requirements of the Wisconsin Department of Natural Resources, using the best technology available at the time to prevent leaching and leakage of the heavy metals in the 22.3 million gallons of sludges. Whether this was good enough is a debatable question. CMC contends that as a result of the bankruptcy it may discontinue the debate.

Wheeler Pit came to the attention of the Environmental Protection Agency early in the Agency's existence. GM and state officials occasionally monitored groundwaters in the area. Readings led the EPA to put Wheeler Pit on the National Priorities List established by § 105(a)(8) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C.

§ 9605(a)(8). The listing took effect on September 21, 1984, 49 Fed.Reg. 37070, a year before the final date for filing claims in the bankruptcy. Listing has no direct legal consequence, but it signifies the EPA's belief that the site is releasing or likely to release hazardous substances. Because it reveals the EPA's assessment of hazards and (rough) priorities for cleanup, listing is an ominous sign. If it does nothing else, listing makes the parcel something less than prime real estate, with effects on the owner's wealth. See *Kent County v. EPA*, 963 F.2d 391, 393–94 (D.C.Cir.1992); *Anne Arundel County v. EPA*, 963 F.2d 412, 413, 415–16 (D.C.Cir. 1992).

Once the EPA gets around to a more detailed analysis, it may take two routes under CERCLA. Section 107(a)(2), 42 U.S.C. § 9607(a)(2), provides that the owner or operator of the site when the wastes were deposited must pay for removal or treatment (which the statute calls "response costs"), reimburse the Superfund if the EPA taps that source to cope with the gunk, and pay damages for any injury to the environment. Section 106(a), 42 U.S.C. § 9606(a), provides that "when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat". The President also may issue "such orders as may be necessary to protect public health and welfare and the environment." The President has delegated this power to the EPA. The owner of the land when the order issues (or the Attorney General applies to the court) is among the persons responsible. See *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985); 42 U.S.C. § 9607(a)(1).

The EPA issued an order under § 106(a) requiring CMC and GM to clean up Wheeler Pit. CMC repaired to the bankruptcy court, contending that the order violates the injunction that court issued at the end

of the reorganization. The injunction bars all actions against the railroad and its successors "by reason of or on account of any obligation ... incurred by the Debtor or by the Trustee, except the obligations imposed upon or required to be assumed by the Reorganized Company by the Plan [of reorganization] ... or this Order." CMC maintained that the EPA's order reflects an "obligation"—the duty to clean up or pay— that existed during the bankruptcy and therefore is barred. The EPA knew about Wheeler Pit, and even put it on the National Priorities List, while the reorganization was ongoing, yet the United States did not file a claim in the bankruptcy. Having slept through the reorganization, the United States is barred like any other creditor, CMC concludes. The court denied CMC's application, distinguishing its liability as owner at the time of the dumping from its liability as owner at the time of the EPA's order. 130 B.R. 521 (N.D.Ill.1991). The former is covered by the injunction but the latter is not, for the costs of current ownership are not an "obligation ... incurred by the Debtor or by the Trustee". We agree with that conclusion.

A fundamental idea of bankruptcy is that bygones should not prevent the best current deployment of assets. Sunk costs and their associated promises to creditors create problems of allocation when the firm cannot pay its debts as they come due. But assets that cannot generate enough revenue to pay all claims may still produce net profits from current operations. So bankruptcy cleaves the firm in two. Existing claims must be satisfied exclusively from existing assets, while the "new" firm, created as of the date the petition is filed, carries on to the extent current revenues allow. *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562 (7th Cir.1986). Old debts will drag down current operations unless they are pooled and paid (or written) off together, so old claims may not be asserted against current operations. The idea of CERCLA is that sunk wastes differ from sunk costs. Seepage reduces current welfare as stale debts and like bygones do not, and it may be cheaper to purge or encapsulate the

wastes than to let sleeping dogs lie. Having been a debtor in bankruptcy does not authorize a firm to operate a nuisance today, *Ohio v. Kovacs*, 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985), or otherwise excuse it from complying with laws of general application. See *In re Chateaugay Corp.*, 944 F.2d 997, 1006–09 (2d Cir.1991); *In re Penn Central Transportation Co.*, 944 F.2d 164, 167–68 (3d Cir.1991); *In re Chicago, Rock Island & P. R.R.*, 794 F.2d 1182 (7th Cir.1986); Douglas G. Baird, *The Elements of Bankruptcy* 194–98 (1992).

To the extent §§ 106 and 107 require a person to pay money today because of acts before or during the reorganization proceedings, CERCLA creates a "claim" in bankruptcy. Whatever doubts there may be about the status of contingent and hard-to-quantify environmental claims under the Bankruptcy Code of 1978, compare *Chateaugay*, 944 F.2d at 1002–05, with Douglas G. Baird & Thomas H. Jackson, *Kovacs and Toxic Wastes in Bankruptcy*, 36 Stan. L.Rev. 1199 (1984), there can be no question that the railroad's potential liability for Wheeler Pit in 1985 falls within § 77(b) of the 1898 Act, which applies to debts and "other interests of whatever character." 11 U.S.C. § 205(b) (1976 ed.). Cf. Robert E. Ginsberg, 1 *Bankruptcy* § 12.07[b] (1991 Supp.). Reading "claim" broadly ensures that those injured by the debtor's wastes share in the available assets, just as those run down by its trains are entitled to distributions as creditors. Because the United States neglected to file a claim under CERCLA in the reorganization, CMC's liability as the operator or manager of Wheeler Pit before the bar date in 1985 is extinguished. Section 77(f), 11 U.S.C. § 205(f) (1976 ed.).

Liability under § 106 in conjunction with § 107(a)(1) is a different matter. By authorizing the President to direct the current owner to clean up a dump, CERCLA creates a claim running with the land. Such claims depend not at all on the debtor's actions before or during the reorganization. To see this, suppose CMC had sold

Wheeler Pit to Exxon a year after the confirmation of its plan of reorganization. As the owner, § 107(a)(1), Exxon could be responsible today for cleanup under § 106(a) even though it played no role in depositing the paint sludge. *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir.1992). CMC would have to compensate any buyer for the expected cost of the cleanup—by accepting a lower price, or by paying someone to take the Pit off its hands. Compensation to the buyer means that CMC bears the economic costs of cleanup, no matter what bankruptcy law says, if it sells the property. It would make no sense under either bankruptcy law or CERCLA to say that so long as Wheeler Pit remains in CMC's hands, it may discharge toxic metals into the water table without possibility of redress, but that as soon as CMC sells or transfers the land the new owner is saddled with cleanup obligations (and CMC bears their costs). Bankruptcy is designed to sever the link between debts for bygones and current operations. CMC's position, by contrast, would maintain that link so long as the ex-debtor holds onto the asset.

*Kovacs* settles all questions on this score. Although the Court held that environmental loss that has been monetized by the conclusion of the bankruptcy case is a claim, and hence may be discharged, it added: "we do not question that anyone in possession of the site—whether it is Kovacs [the debtor] or another ..., or a vendee from the receiver or the bankruptcy trustee—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions." 469 U.S. at 285, 105 S.Ct. at 711. Just as security interests and other liens pass through a bankruptcy unaffected, see *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992); *Long v. Bullard*, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), and stick with the asset on transfer to any new buyer, so a statutory obligation attached to current ownership of the land survives bankruptcy.

The adage that liens pass through bankruptcy can be misleading; the Code permits delay and may cut down the value of the lien in other ways even though the legal entitlement reemerges after the reorganization. See *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *In re James Wilson Associates*, 965 F.2d 160, 171–72 (7th Cir. 1992). Just so here: the public gains less from relief in 1992 than from a cleansing in 1974 or 1985, for noxious substances have escaped in the interim. But the entitlement to the cleanup survives, just as the lien survives.

■ What remains in question is whether the EPA's order really depends on CMC's current ownership of Wheeler Pit. CMC's liability under § 107 for damages and other relief that may be awarded against the "operator" of the facility vanished in the reorganization when the United States neglected to file a claim. To avoid the conclusion that it is repackaging a forfeited claim for damages, the EPA must establish that harmful releases are threatened or ongoing—in the language of § 106(a), that the Pit poses "an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance". Otherwise there is no nuisance to clean up.

Paragraphs N and R of the EPA's cleanup order make this statutory finding. The Agency took samples of the wastes and found barium, cadmium, chromium, lead, mercury, xylenes, toluene, and several forms of benzene. No surprises; these are standard components of paint. Are they escaping from the Pit? The EPA wrote: "Analyses of groundwater performed during the RI [the "remedial investigation"] revealed the presence of a number of hazardous substances as defined in Section 101(14) of CERCLA, including toluene, xylenes, chlorinated benzene compounds, phthalates and metals." Presence of these substances in the groundwater is consistent with leaching from the deposits in the Pit. It is also consistent with migration

from another source, including rocks that were present in Wisconsin before the dawn of man. Determining the source of toxic substances, and not merely their presence in the water, entails comparing readings near the facility with other samples for which the facility in question is not a likely source. CMC denies that Wheeler Pit is the source of what the EPA found in the water and observes that the order was issued without adversary presentation. That the EPA's water samples contained chromium but not barium, cadmium, lead, or mercury suggests that there may be something to CMC's protest. Is such selectivity a likely outcome of the process of leaching?

Whether the EPA is right or wrong is not, however, a subject for the bankruptcy court. CERCLA postpones all judicial review of administrative orders under § 106(a) until the work has been performed or the EPA itself applies for judicial enforcement. Section 113(h), 42 U.S.C. § 9613(h). See *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244–45 (7th Cir.1991); *Schalk v. Reilly*, 900 F.2d 1091, 1095 (7th Cir.1990). Judicial contemplation is notoriously slow. Section 113(h), like other provisions of CERCLA and many other environmental laws, see *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978); *Roll Coater, Inc. v. Reilly*, 932 F.2d 668 (7th Cir.1991), is designed to expedite action, while making clear that the EPA, which issued the order, bears the ultimate costs of error. Firms needlessly told to clean up may recover their costs from the EPA afterward. In the meantime they must get the lead out.

CMC conceded at oral argument that, if Wheeler Pit is emitting hazardous substances today, the bankruptcy order does not relieve it of an obligation to join GM in putting a stop to that problem. So the request to the bankruptcy court stands revealed as an effort to avoid § 113(h). Congress put decontamination ahead of litigation, and we shall continue to enforce that rule, as we did in *North Shore Gas* and *Schalk*. If the EPA's findings of hazard are right, then there is no bankruptcy ob-

stacle to the order. If the EPA's findings are wrong, then CMC is entitled to be compensated for its efforts—for it cannot be liable as the operator of the facility at the time GM dumped the sludges. Whether the EPA is correct is a subject for another forum, another day.

AFFIRMED.