In re INDUSTRIAL SALVAGE,
INC., Debtor.

INDUSTRIAL SALVAGE, INC., Plaintiff,

v.

The PEOPLE OF the STATE OF
ILLINOIS, Defendant.

In re John PRIOR.

John PRIOR, Plaintiff,

v.

The PEOPLE OF the STATE OF
ILLINOIS, Defendant.

Bankruptcy Nos. 93–40767, 93–40768.
Adv. Nos. 95–4107, 95–4108.

United States Bankruptcy Court,
S.D. Illinois.

June 6, 1996.

Robert T. Bruegge, Edwardsville, IL, for Plaintiffs.

Thomas Davis, Asst. Attorney General, State of Illinois, Springfield, IL, for Defendant.

## OPINION

KENNETH J. MEYERS, Bankruptcy Judge.

These adversary proceedings present the common issue of whether the debtors' obligation to effect closure of three landfills and to abate or mitigate environmental damage caused by the lack of proper closure constituted a "claim" under 11 U.S.C. § 101(5) that was discharged by confirmation of the debtors' Chapter 11 plans. *See* 11 U.S.C. § 1141(d). The debtors contend that because compliance with the administrative order mandating closure of the landfills would require an expenditure of money by the debtors, it imposed a monetary obligation that was discharged as a "claim." The govern-

ment responds that, rather than exacting a money payment from the debtors, the cleanup order granted equitable relief for which there was no alternative right to payment and thus imposed an obligation that survived the debtors' bankruptcy. In addition, the government asserts that because the environmental problems giving rise to the administrative cleanup order are ongoing and have continued beyond the debtors' discharge to the present time, the debtors cannot escape liability by reason of such discharge.

### I.

The facts are undisputed. On October 15, 1993, debtors John Prior and Industrial Salvage, Inc., filed for relief under Chapter 11 of the Bankruptcy Code. John Prior owned three landfills in Marion County, Illinois, known as the Centralia/Prior, Prior/Blackwell, and Industrial Salvage sites. The Industrial Salvage site had been operated through a permit issued to Industrial Salvage, Inc., a corporation of which Mr. Prior is the sole shareholder and president. At the time of bankruptcy, no waste disposal operations were being conducted at the landfills, having ceased at the Centralia/Prior and Prior/Blackwell sites in June 1987 and at the Industrial Salvage site in December 1989.

On December 8, 1993, the State of Illinois, acting at the request of the Illinois Environmental Protection Agency, began an enforcement action regarding these landfills before the Illinois Pollution Control Board ("Board").[1] In its complaint, the State alleged that the debtors had failed to close the landfills in a manner that would control post-closure releases, as required by the Illinois Environmental Protection Act ("Act") and the Board's waste disposal regulations,[2] and

---

1. The State did not seek or obtain relief from the automatic stay to file this action. However, the debtors do not contest the State's assertion that its action was permitted under 11 U.S.C. § 362(b)(4), which provides an exception to the automatic stay for governmental enforcement actions.

2. Specifically, the State alleged violations of § 12(a) of the Act, which prohibits any person from causing, threatening, or allowing the discharge of contaminants into the environment so as to cause water pollution, and § 12(d) of the

Act, which prohibits the deposit of contaminants in such a place and manner as to create a water pollution hazard. *See* 415 ILCS 5/12(a), (d) (1993). In addition, the State alleged violations of permit and reporting requirements of the Act, *see* 415 ILCS 5/21(d), (o) and 5/21.1(a), as well as violations of Board regulations relating to the proper closure of landfills. *See, e.g.,* 35 Ill.Adm. Code 807.318 (post-closure monitoring and remedial action), 807.506 (initiation of closure), 807.508 (certification of closure).

that this failure had resulted in pollution from leachate [3] flows into the public waters.

On June 7, 1995, following a hearing, the Board issued its order directing the debtors to act immediately to remedy the violations cited by the State. The Board found that the debtors' lack of closure and post-closure care at the three sites was "threatening or possibly causing" water pollution in nearby waters and that contaminants were "being released to the environment" as a result of exposed waste. *See* Order, Ex. A to Pltf.'s Complt., filed Dec. 12, 1995, at 22. The Board stated that

> the extreme nature of the environmental problems at the three sites requires an immediate cease and desist order, which will direct ... closure of the Centralia/Prior, Prior/Blackwell, and Industrial Salvage sites and initiation of post-closure care and monitoring. The Board believes such an order is necessary to alleviate a serious threat to the public health and the environment.

*Id.* at 23.

In accordance with these findings, the Board ordered the debtors to immediately complete closure of the Centralia/Prior and Prior/Blackwell sites and to correct nonconforming conditions and initiate closure of the Industrial Salvage site. *Id.* at 25. Noting that the State had waived any monetary penalties against the debtors because of their pending bankruptcy proceedings, *id.* at 21, the Board limited its order to requiring the debtors to close the three sites and comply with reporting requirements regarding such closure. *Id.* at 21, 24–25. In addition, the Board directed the debtors to post financial assurance guaranteeing their performance as required by the Act and Board regulations.

*Id.* at 25. The Board further revoked the debtors' development permit for the Industrial Salvage site because of the severity of the debtors' past and present violations and the threat to public health and the environment. *Id.*

Meanwhile, the debtors' reorganization proceedings continued, and their Chapter 11 plans were confirmed in June 1995 (John Prior) and August 1995 (Industrial Salvage, Inc.). Although the debtors' plans made no provision for the landfills at issue, their intention regarding the Industrial Salvage landfill was set forth in John Prior's disclosure statement, which indicated that the debtors would hire an individual to determine from the State "exactly what violations exist at the landfill" and seek a buyer "who can rectify the problems and purchase it 'as is.' " Discl. St. of John Prior, filed April 4, 1995, at 5. Such a sale, Mr. Prior declared, would result in "a significant payment to the [estate]," since the net proceeds from the sale "[would] be available to the debtor's estate." *Id.*

Notwithstanding the debtors' intention, the Industrial Salvage landfill was not sold, and, in December 1995, following confirmation of the debtors' plans and entry of the Board's order, the debtors filed the present dischargeability actions. In these actions, the debtors argue that the Board's order requiring closure of the subject landfills imposed a financial burden constituting a "claim" in the debtors' bankruptcy proceedings. In support, the debtors cite a reference in the Board's order to cost estimates for closure and post-closure care of the landfills.[4] *See* Order, at 3–4. Further, the debtors note that the order required the debtors to post

---

3. "Leachate" has been defined as "[a]n aqueous liquid that contains soluble or suspended matter acquired as the water percolates through solid waste, soil, ... or other materials." *See New Castle County v. Hartford Acc. & Indem. Co.*, 933 F.2d 1162, 1167 n. 5 (3d Cir.1991). The water producing the leachate can be the result of moisture originally contained in garbage, precipitation, groundwater or a combination of the three. *Orange Environment, Inc. v. County of Orange*, 923 F.Supp. 529, 531 n. 3 (S.D.N.Y. April 18, 1996).

4. The cost estimates were included in "closure plans" submitted by the debtors for the three landfills. The closure plans for the Centralia/Prior and Prior/Blackwell sites, approved by the Board in September 1986, estimated closure and post-closure costs at $46,260.44 and $29,009.16, respectively; while the closure plan for the Industrial Salvage site estimated these costs at $81,346.25. The debtors were required by Board regulations to revise these cost estimates on a biennial basis, *see* 35 ILCS 807.623(a)(b), and (c), but had not done so. *See* Order, at 14, 24.

financial assurance guaranteeing their performance of the closure obligation. *See id.,* at 15, 25. These provisions, the debtors contend, demonstrate that the environmental problems giving rise to the cleanup order are "something money will fix," rendering their obligation to close the landfills a financial obligation. In addition, the debtors point to the Board's statement that "it is technically practicable to alleviate [the] environmental problem[s] [referred to in the order] through proper closure and post-closure care and monitoring." *See* Order, at 22. From this, the debtors reason that the problems referred to in the Board's order could have been "fixed permanently" prior to confirmation by an expenditure of money and that the order, therefore, imposed a monetary obligation that was discharged as a "claim" under 11 U.S.C. § 1141(d).

## II.

Section 1141(d)(1) provides for the discharge upon confirmation of a Chapter 11 plan of "any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). "Debt" is defined under the Bankruptcy Code as "liability on a claim," 11 U.S.C. § 101(12), while "claim" is defined as a

(A) right to payment, ... or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment....

11 U.S.C. § 101(5)(A), (B). Under this definition, a "claim" includes two kinds of obligations: those involving purely legal rights, such as for money or damages, and those for which breach entails an equitable remedy—but only if such breach also gives rise to a right to payment. Thus, an equitable obligation constitutes a "claim" under § 101(5)(B) only if money can be substituted for the performance of such obligation.

■ An environmental cleanup order such as that in the present case, while affording equitable or injunctive relief, may nevertheless qualify as a "claim" under § 101(5)(B) if the government seeks to enforce the order by proceeding against the debtor's assets or if, under the operative statute, the government has the option of cleaning up the pollu-

tion itself and seeking reimbursement from the debtor. *See generally* Kathryn R. Heidt, *Environmental Obligations in Bankruptcy: A Fundamental Framework,* 44 Fla.L.Rev. 153, 173–74 (1992). In such circumstances, the debtor's affirmative obligation to perform a cleanup is transformed into a right to payment in favor of the government. Thus, in *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the court found that the debtor's obligation under an injunction requiring removal of hazardous wastes from his property was transformed into a "right to payment" when the government, prior to bankruptcy, obtained appointment of a receiver to complete the cleanup and then sought money from the debtor to fund the cleanup. Since the debtor, having been dispossessed, could no longer clean up the property himself, the court ruled that the only performance sought by the government was the payment of money and that the debtor's obligation under the cleanup order had been reduced to a monetary claim that was dischargeable in bankruptcy. *Id.,* at 283, 105 S.Ct. at 710.

The court in *In re Chateaugay Corp.,* 944 F.2d 997 (2d Cir.1991), extended the rule of *Kovacs,* finding that an order seeking injunctive relief against the debtor nevertheless constituted a "claim" when the statute under which it was imposed allowed the government to effect the cleanup itself and seek "recovery costs" against the debtor. *Id.,* at 1008. Even though the government had not yet performed such a cleanup but had only an optional right to do so, the court reasoned that its decision not to exercise the right to payment in no way negated the existence of that right. *Id; see In re Chateaugay,* 112 B.R. 513, 522 (S.D.N.Y.1990). Thus, the government's optional right to payment under the statute rendered the debtor's cleanup obligation a "claim" that was dischargeable in bankruptcy.

■ While the debtors in this case rely on *Kovacs* and *Chateaugay* as supporting dischargeability of their obligation under the Board's order, the debtors' liability for closure and post-closure care of the subject landfills differs substantially from the obligations at issue in those cases. Unlike in

*Kovacs,* the State here has not sought to enforce the Board's order by obtaining possession of the offending property, and the debtors, following reorganization in their Chapter 11 proceedings, retain full control over the landfills as required to comply with the Board's order. In addition, at no time has the government sought money from the debtors as an alternative to performance of their obligation to close the landfills and prevent ongoing pollution. The State here has taken no action to transform the debtors' closure obligation to a right to payment, and *Kovacs* thus fails to support the debtors' contention that this liability is dischargeable as a claim under § 101(5)(B).

The present case is likewise distinguishable from *Chateaugay* in that the State here, unlike the government in *Chateaugay,* has no option under the relevant environmental provisions to complete closure of the landfills and seek recovery from the debtors for the costs associated with such closure. The statute at issue in *Chateaugay,* the "Comprehensive Environmental Response, Compensation, and Liability Act of 1980" or CERCLA, 42 U.S.C. § 9601 *et seq.,* allows for recovery by the government of so-called "response costs" from parties responsible for the release of hazardous substances when such parties fail to respond to enforcement procedures and the government finds it necessary to clean up the property itself. *See* 42 U.S.C. §§ 9604(a)(1), 9607(a).[5] However, both CERCLA and state Superfund statutes enacted pursuant to CERCLA pertain to the release of hazardous substances and are inapplicable to solid waste violations such as those in this case. Indeed, under Illinois law, the State's ability to seek recovery from responsible parties for cleanup costs is limited to instances involving the release of hazardous substances. *See* 415 ILCS 5/22.2. Hazardous substances are not at issue in the present case, and the State thus lacks statutory authority to recover the costs of compliance from the debtors. For this reason, the debtors' argument that their closure obligation constitutes a claim under *Chateaugay* must fail.

The debtors assert, however, that because the Board's order required them to post financial assurance guaranteeing closure of the landfills, the State can "get money from" them to complete such closure and thus has a right to payment against them. Under Illinois law, landfill operators seeking a permit are required to post "a performance bond or other security for the purpose of insuring closure of the [landfill] site and post-closure care...." 415 ILCS 5/21.1(a). The State "is entitled to collect monies from such performance bonds or other securities" under specified conditions to fulfill the statutory purpose. 415 ILCS 5/21.1(b). However, the State's ability to proceed against these performance bonds or securities to fund closure of a landfill does not give the State a right to payment against the operators themselves.

In this case, the parties disclosed at trial that the State had been unsuccessful in collecting against performance bonds on the debtors' landfills and that monies in a "trust fund" to be used for closure of the Industrial Salvage site were inadequate to complete such closure.[6] While counsel for the State could not specify what measures would be taken against the debtors to enforce the Board's closure order, it is clear that the State's right to recover by reason of the performance bond requirement is limited to collecting against such bonds themselves and would not afford the State additional rights against the debtors as operators. As a result, this requirement in the Board's order does not transform the debtors' closure obligation into a right to payment so as to constitute a claim under § 101(5)(B).

---

**5.** Payment for the initial cleanup is made from the "Hazardous Substance Superfund," established by Congress for that purpose. *See* 26 U.S.C. § 9507. Any recovery from a person responsible for the cleanup is then added back to the Superfund.

**6.** The parties did not elaborate concerning this so-called "trust fund." However, the Court notes that the statutory provision setting forth the performance bond requirement creates a special fund known as the "Landfill Closure and Post–Closure Fund" and states that

> [a]ny monies forfeited under this section shall be placed in the "Landfill Closure and Post–Closure Fund" and shall ... be used ... for the purposes for which such performance bond or other security was issued.

415 ILCS 5/21.1(c).

■ The Court finds without merit the debtors' related argument that their obligation under the Board's order constitutes a claim because compliance with the order, including the requirement that they post financial assurance, would entail an expenditure of money from them. Virtually any enforcement action seeking injunctive relief, other than one involving the mere cessation ·of unlawful activity, imposes some cost on the violator. *See In re Torwico Electronics, Inc.,* 8 F.3d 146, 150 n. 4 (3d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1576, 128 L.Ed.2d 219; *Chateaugay,* 944 F.2d at 1000. Environmental cleanup orders, in particular, often require an expenditure of money in order to clean up immediate and ongoing · pollution, and the government may exercise its regulatory powers and force compliance with its laws even though a debtor must spend money to comply. *Torwico,* 8 F.3d at 150. Thus, while an equitable obligation constitutes a "claim" under § 101(5)(B) if money may be substituted for performance of the obligation, such an obligation does not become a "claim" merely because it requires the expenditure of money.

The Board's order in this case requires the debtors to act affirmatively to close the subject landfills and comply with post-closure care requirements. The order provides no alternative for the debtors to pay money to be relieved of this obligation. Although, as noted by the debtors, the order contains cost estimates for complying with closure and post-closure care requirements, these estimates were made as part of the original permitting process,[7] and the Board's reference to the estimates does not signify that the debtors could fulfill their obligation under the order by paying these amounts to the State. Since the Board's order affords the State only an equitable remedy against the debtors with no alternative right to payment for the debtors' breach, the Court finds that the debtors' obligation for closure and post-closure care under the Board's order fails to come within the definition of "claim" in

§ 101(5)(B) so as to be dischargeable in the debtors' bankruptcy proceedings.

### III.

■ Even if the Court were to accept the debtors' argument that their obligation to close the landfills constituted a "claim" because the problems caused by lack of closure could have been alleviated by the payment of money, the ongoing nature of the problems referred to in the Board's order prevents the debtors from obtaining a discharge of their liability in these bankruptcy proceedings. The dischargeability of environmental obligations in bankruptcy raises both definitional and timing issues, requiring a determination, first, of whether the government has a "claim" and, if so, whether the claim arose within the time for discharge. *See* Heidt, *supra,* 44 Fla.L.Rev. at 162. Since only pre-confirmation debts are discharged in a Chapter 11 case, an obligation not to pollute in the future is not discharged under 11 U.S.C. § 1141(d), as a new cleanup obligation arises every day and continues to arise post-confirmation. *See id.,* at 180. If a Chapter 11 reorganization is successful and the debtor retains the property after confirmation, the reorganized debtor must comply with applicable environmental laws as the new owner of the property. Therefore, while such a debtor may argue that the cleanup obligation, being based on pre-confirmation acts, is a dischargeable debt, the debtor will nonetheless be liable for ongoing pollution as the current owner of the property. *See id.,* at 180–81.

In *Matter of CMC Heartland Partners,* 966 F.2d 1143 (7th Cir.1992), the court considered whether a reorganized Chapter 11 debtor could escape liability for cleanup of a hazardous waste site which resulted from the debtor's prepetition activity but from which seepage continued to occur after confirmation. The court found that while the reorganized debtor was discharged of liability for acts occurring before or during bankruptcy,

---

**7.** The Board's regulations require a landfill operator to prepare a closure/post-closure care plan as part of the permit process. This plan, in turn, serves as the basis for making cost estimates to implement the financial assurance requirements

of the Act. *See generally John Sexton Contractors Co. v. Ill. Pollution Control Bd.,* 201 Ill.App.3d 415, 146 Ill.Dec. 888, 890, 558 N.E.2d 1222, 1224 (1990).

it remained liable as the new owner of the property for cleanup of ongoing pollution after bankruptcy. *See id.,* at 1146–47. The court stated that the reorganized debtor, as owner of the property, was required to clean up the waste site in question and termed this obligation a "claim running with the land." *See id.* Since the debtor retained ownership of the property after bankruptcy, it was responsible for ongoing pollution on the property just as if the property had been sold to another entity that had played no role in depositing the waste. *Id.*

In this case, the Board specifically found that the environmental problems caused by the debtors' failure to close the landfills were ongoing and that the debtors were responsible as current owners of the landfills for pollution resulting from the release of contaminants into nearby waters. The Board further found that the threat to public health and the environment from ongoing releases could only be alleviated by proper closure and post-closure care of the landfills. While the debtors attempt to distinguish between their liability to close the landfills, which, they contend, was discharged as arising from prepetition acts, and their continuing liability to monitor the landfills after closure, this is a meaningless distinction. The debtors, following their reorganization in Chapter 11, are obligated as owners of the landfills to remedy ongoing pollution caused by failure to close the landfills, and this obligation necessarily requires that the landfills be closed. The debtors' responsibility to close the landfills to halt ongoing releases arose not from their prepetition acts but from their ownership of the landfills following confirmation. As such, the Board's order requiring closure of the landfills created an obligation "running with the land" that was not discharged upon confirmation under § 1141(d).

The debtors implicitly recognized that responsibility for closure of the landfills derived from ownership of the property when, in their disclosure statement, they stated that they intended to sell the Industrial Salvage landfill "as is," with the new owner assuming liability for the environmental problems outlined by the State. While the debtors did not, in fact, sell this or the other

landfills, they are not relieved of their liability for ongoing pollution on property retained by them merely because they have passed through bankruptcy. *See CMC Heartland,* 966 F.2d at 1147. It would make no sense under either bankruptcy or environmental laws to say that so long as contaminated property remains in the hands of an ex-debtor, such debtor may continue polluting without the possibility of redress, but that as soon as the debtor sells or transfers the property, the new owner is saddled with a cleanup obligation. *Id.*

The debtors here had and continue to have the option of selling the property at a discounted price, taking into account the costs of bringing the landfills into compliance. While they assert that the State diminished the value of the landfills by revoking their permit on the Industrial Salvage site and thereby made them unable to clean up the property themselves, nothing prevents them from carrying out their original intention of selling the property to a new owner who can bring the landfills into compliance. In any event, they remain liable as current owners of the property to complete closure of the landfills and thus eliminate the continuing pollution on the property.

For the reasons stated, the Court finds that the debtors' obligation under the Board's order for closure and post-closure care of the three landfills was not discharged as a claim in their Chapter 11 bankruptcy proceedings. The Court, accordingly, finds for the State and against the debtors on their complaints to determine dischargeability of debt.