**HATCO CORPORATION, Plaintiff,**

v.

**W.R. GRACE & CO.—CONN., Defendant and Third Party Plaintiff,**

v.

**ALLSTATE INSURANCE COMPANY (as Successor to Northbrook Excess and Surplus Insurance Company), et al., Third–Party Defendants.**

**Civ. A. No. 89–1031.**

United States District Court, D. New Jersey.

July 27, 1992.

1310

1312

Aubrey M. Daniel, III, Paul Mogin, Evan J. Roth, Dane H. Butswinkas, Williams & Connolly, Washington, D.C., Robert M. Goodman, Carpenter, Bennett & Morrissey, Newark, N.J., for plaintiff.

Randy Paar, Elizabeth A. Sherwin, Frank S. Occhipinti, Anderson Kill Olick & Oshinsky, New York City, Anthony Marchetta, Hannoch Weisman, Roseland, N.J., for defendant.

**1314**

## OPINION

WOLIN, District Judge.

Our society's destruction of its own living environment is a problem that we increasingly must confront. For centuries humankind has polluted the Earth's land, air and waterways with impunity, under the assumptions, now known to be false, that the Earth's resources are inexhaustible, and that advances in technology would in any event solve our environmental problems faster than we could create them.

To some extent we are all responsible for the past lax practices of industry and government.[1] That we, through our representatives in government, tolerated standards and practices that allowed wholesale dumping of untreated chemicals and other forms of hazardous waste onto our land, and into our water and air, bespeaks of our lack of forethought as a society. To the extent these cheaper, though harmful waste disposal practices lowered the prices we paid for consumers products or government services, or created wealth for great numbers of shareholders of publicly traded companies, the inescapable fact remains that we all benefitted directly from this conduct.

At long last we have recognized the frailty created by our shortsightedness and have begun to take steps to reduce the rate of the Earth's destruction, and to remediate our past transgressions against the planet. For its part, through the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") as amended, 42 U.S.C. § 9601 et seq., Congress has fashioned a statutory framework intended to motivate individuals to cleanup their own land by providing the incentive that they may recover all costs from other parties to whom the environmental damage is attributable. Conceived in haste and born out of compromise, that statute has produced significant litigation over the meaning of even its most basic

terms,[2] and has not, after a decade, produced a fraction of the results envisioned by Congress. As this case well demonstrates, the legal, economic and political difficulties involved in fairly and accurately allocating financial responsibility for the cleanup of past environmental abuses present problems perhaps more daunting than the scientific and engineering problems faced in the actual remediation of the polluted sites.

This is a case brought pursuant to CERCLA and state common law. The current owner of an industrial site located in Fords, New Jersey—Hatco Corporation ("Hatco")—who has conducted chemical manufacturing operations on the site for thirteen years, has sued its predecessor-in-title—W.R. Grace & Co.—Conn. ("Grace")—who conducted chemical manufacturing operations on the site for close to twenty years. A cast of numerous third-fourth- and fifth-party insurance company defendants have been impleaded into the action. All are battling to avoid responsibility for costs to monitor, evaluate and remediate the Fords tract.

For more than three decades, that site has been polluted by a wide variety of toxic chemical compounds (including known carcinogens) that have been defined by the Environmental Protection Agency as "hazardous substances." Voluminous evidence presented to the Court demonstrates the extent to which this land has been polluted. Through the practice of pumping millions of pounds of effluent yearly from its chemical manufacturing operations into lagoons and holding ponds on the site, the owners and operators of the site have thoroughly saturated the ground with toxic wastes. Much of it continues to migrate under the earth, spreading the poisons over a wider area and contaminating the groundwater. Illustrative of conditions at the site is the existence of a marsh filled with black

---

1. As continuing revelations indicate, federal, state and local governments have contributed directly to the substantial pollution of the United States.

2. The Third Circuit Court of Appeals has observed that

CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage.

*Artesian Water Co. v. Government of New Castle County,* 851 F.2d 643, 648 (3d Cir.1988).

sludge that exudes a strong mothball odor. Estimates of potential cleanup costs have been suggested by the parties in the range from "tens of millions" of dollars upward to $100 million.

Before the Court are a number of motions by and between Hatco and Grace. First are cross-motions for summary judgment on the issue whether Grace's liabilities under CERCLA were assumed by Hatco under the 1978 Sale Agreement in which Hatco purchased the Fords, New Jersey facility that is the subject of this action. Grace asserts that it is entitled to a judgment, as a matter of law, that under the Sale Agreement, Hatco assumed responsibility and agreed to indemnify Grace for all costs to remediate and remove hazardous substances that may have been disposed of on the Fords site when it was owned by Grace, with the exception of those liabilities for which Grace is effectively insured. Hatco, conversely, asserts that it is entitled to a judgment as a matter of law that it did not under the Agreement assume any such responsibilities. For the reasons that follow, the Court will deny Grace's motion and grant Hatco's motion.

Second is the motion of Grace for summary judgment in its favor on Hatco's claim under state common law for damage to property based on a theory of strict liability. Grace bases its motion on the grounds that: (1) Hatco assumed the risk of the abnormally dangerous conditions at the site; and (2) Hatco's claims are time-barred by the statute of limitations. For the reasons that follow, Grace's motion will be granted on the statute of limitations ground.

Third is a motion by Hatco to strike a number of defenses from Grace's Answer to the Second Amended Complaint. For the reasons stated below, that motion will be granted in substantial part.

Fourth is a motion by Hatco for partial summary judgment against Grace on the issue of Grace's liability for all response costs under CERCLA. Grace has cross-moved, contingent on the Court granting Hatco's motion, for a declaration that Hatco is liable in contribution for its equitable share of response costs. Hatco's motion will be denied, and Grace's motion will therefore not be reached.

Fifth are cross-motions for summary judgment on the issue whether response costs already incurred by Hatco to clean up one area of the site were incurred in compliance with the national contingency plan. Both motions will be denied.

Last, the parties have cross-moved for summary judgment on the issue whether attorneys' fees are recoverable by a private party in a response cost action under CERCLA. Because the Court adheres to its view, expressed in a previous case, that such fees are not recoverable, Hatco's motion will be denied, and Grace's will be granted.

## BACKGROUND

From 1959 until 1978, Grace owned and operated a chemical manufacturing business located on an approximately 80–acre tract of land in Fords, New Jersey, that used and produced a number of different chemical products, consisting primarily of plasticisers and synthetic lubricants. The business was run by a division of Grace known as Hatco Chemical Division. On August 21, 1978, Grace simultaneously sold "the Chemical Assets other than the Chemical Realty" of the Hatco Chemical Division to the Farben Corporation ("Farben"), and the "Chemical Realty" to the Fuss Corporation ("Fuss"). Fuss and Farben were owned by Alex Kaufman, who had worked at the Fords Hatco site for over twenty years, both for Grace and its predecessor. On September 1, 1978, Farben changed its name to the Hatco Chemical Corporation. On September 30, 1978, Fuss merged into the Hatco Chemical Corporation. On October 28, 1986, the Hatco Chemical Corporation was renamed the Hatco Corporation.

In the Sale Agreement, "Assumed Liabilities and Obligations" is defined as:

(a) liabilities of Chemical [3] reflected in, reserved against or noted on the Closing

___

3. "Chemical" is defined in the Sale Agreement as "the Chemical Division of the Hatco Group of

Net Statement, other than Excluded Liabilities;

and

(b) the following obligations and liabilities existing on the date of the Closing, or in the case of those described in clause (iv), arising thereafter, whether or not they are reflected in, reserved against or noted on the Closing Net Statement:

(i) obligations with respect to sales orders accepted by the Chemical Business [4] other than Excluded Liabilities;

(ii) obligations for goods and services ordered by the Chemical Business, other than Excluded Liabilities;

(iii) liabilities and obligations with respect to capital expenditures described in any Request for Capital Appropriation approved in accordance with Seller's customary procedures by the management of the Chemical Business, or any management group of Seller senior thereto;

(iv) other obligations and liabilities arising in the ordinary course of the Chemical Business, whether prior to or after the date of Closing, other than Excluded Liabilities;

(v) other liabilities and obligations of which Alex Kaufman or David G. Seabrook has actual present personal knowledge and awareness at the date of this agreement, other than Excluded Liabilities; and

(vi) other liabilities and obligations which do not exceed $5,000 per item and $50,000 in the aggregate, other than Excluded Liabilities.

Sale Agreement § 1.11 (JA 187).[5]

The Sale Agreement defines "Excluded Liabilities" to include, among other items, "liabilities against which Seller is effectively insured, without regard to any applicable deductible amounts", and "the liabilities specifically described in the schedule to this Section." Sale Agreement § 1.10(c), (h).[6] Included in the schedule to § 1.10 as an excluded liability is the "Alleged pollution of Sling Tail Brook on or about May 31, 1977." [7] (JA 187) Section 2.02 of the Sale Agreement provides, in part, that Hatco would not be responsible for any obligations or liabilities of Grace other than

---

Seller as presently constituted, having its principal executive offices at Fords, New Jersey." Sale Agreement § 1.05.

4. "Chemical Business" is defined in the Sale Agreement as "that business presently conducted by Chemical comprising the manufacture and sale of plasticisers and synthetic lubricants at a principal manufacturing location at Fords, New Jersey. For purposes of this agreement, 'Chemical Business' does not include the business of purchase and resale of oxo-alcohols conducted by Chemical, or any interest of Seller in Grace Petrochemical." Sale Agreement § 1.06.

5. "(JA 187)" refers to Exhibit 187 of the Joint Appendix submitted by the parties.

6. Section 1.10 provides:
"Excluded Liabilities" means the following liabilities and obligations of Seller attributable to the Chemical Business for all periods ending on or prior to the date of the Closing: (a) all liabilities for taxes, including without limitation income taxes ..., (b) notes and accounts payable to other groups, divisions or other units or subsidiaries or affiliates of Seller, other than trade accounts arising from the purchase of goods, (c) liabilities against which the Seller is effectively insured, without regard to any deductible amounts, (d) product liabilities for personal injury, with respect to

merchandise sold or shipped prior to the date of the Closing, (e) liabilities and obligations arising from claims asserted by any employee or former employee with respect to injury, sickness, disease or death or under any disability or workmen's compensation laws, (f) liabilities for which the corresponding assets are prepaid expenses and deferred charges, the benefit of which cannot be effectively transferred to Buyers, (g) liabilities and obligations arising from claims asserted by any of the former owners or managers of any predecessor company, any portion of the business or assets of which is included in the Chemical Business or the Chemical Assets, and (h) the liabilities specifically described in the schedule to this Section.

7. The schedule to section 1.10 consists of the following items:
1. Alleged pollution of Sling Tail Brook on or about May 31, 1977.
2. Canton v. Buffalo Tank, et al., Superior Court of New Jersey, Middlesex County, Docket L–4354–77.
3. Potential claim by Norman Bresee for personal injury incurred at the Chemical plant in 1976.
4. Liloia v. E.I. duPont de Nemours & Co., Inc., et al., Superior Court of New Jersey, Essex County, Docket L–44267–76.

the defined "Assumed Liabilities and Obligations." That section further states that "All such liabilities and obligations not assumed by Buyers are hereby retained by [Grace]".

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.*

### II. *Cross–Motions for Summary Judgment on the Issue Whether Hatco Assumed CERCLA Liability In the Sale Agreement*

■ Both parties have moved for summary judgment on Grace's defenses that Hatco may not recover damages under CERCLA because it assumed all environmental liabilities in the Sale Agreement. Resolution of this motion requires the

Court to apply the standard it previously adopted in *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 354–58 (D.N.J.1991) to the contract in issue in this case. In *Mobay*, this Court recognized, as had other courts before it, that CERCLA allows parties to privately allocate by contract the risk of loss for liabilities under that statute. *See, e.g., Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 89 (3d Cir.1988) ("agreements to indemnify or hold harmless [from CERCLA liabilities] are enforceable between the parties"), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). Because § 9607(e)(1) renders ineffective any attempt to completely "transfer" liability, the most a party can do to limit its liability under CERCLA is to obtain from another an agreement "to insure, hold harmless, or indemnify" it from any liabilities established against it. 42 U.S.C. § 9607(e)(1). To the extent that an agreement to insure, hold harmless or indemnify the seller from CERCLA liability prevents a purchaser from asserting a CERCLA claim against the seller, the agreement can be viewed as a "release." *Mobay*, 761 F.Supp. at 355.

Although CERCLA liabilities can be allocated between parties when expressly agreed to, the problem raised in *Mobay* was whether indemnity agreements entered before the enactment of CERCLA could ever act to release a party from CERCLA liability. Because entered pre-CERCLA, such agreements could not have expressly mentioned CERCLA liabilities in any indemnity, hold harmless or insurance provision. After canvassing the existing law, the Court concluded that parties could have agreed to allocate risks of liability between them arising from CERCLA even prior to the enactment of CERCLA, provided that it was done by written agreement that included "a clear provision which allocates these risks to one of the parties." *Id.* at 358. The Court held that such a "clear provision" must be either: (1) a broad waiver of "all liabilities of *any* type whatsoever",[8] *id.* at 358, n. 15 (emphasis in original),

---

**8.** Although the Court stated only that it "would expect" a broad waiver clause to include an

allocation of risk of loss for CERCLA liabilities, 761 F.Supp. at 358 n. 15, it now makes clear

which would clearly evince the parties' broad intent to finally settle *all* present and future liability issues arising from the sale,; or (2) at a minimum, "must at least mention that one party is assuming [all] environmental-type liabilities", *id.* at 358, which would clearly evince the parties' intent to settle all issues related to present and future environmental liabilities.

■ This holding, as another District Court has recently recognized, was derived substantially from the generally recognized public policy tending toward strict construction of any indemnity agreement under which one party agrees to indemnify another for the consequences of that other's own acts. *See Purolator Products Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 130–31 (W.D.N.Y.1991); *see also Haynes v. Kleinwefers and Lembo Corp.,* 921 F.2d 453, 456–57 (2d Cir.1990) (discussing New York law of indemnity, under which agreement to indemnify another for liability arising from its own acts is construed strictly). Hence, to create a contractual duty of one party to indemnify or hold the other harmless from CERCLA–type liability arising from that other's acts, an unmistakable intent to do so must be expressed in unambiguous terms or be clearly implied. Consequently, extrinsic evidence is for the most part irrelevant to the issue of the parties' intent, and the interpretation of the agreement in issue will always be a question of law ripe for summary judgment. An agreement will either unambiguously express or clearly imply that one party will indemnify the other against its own acts giving rise to liability under CERCLA, or it will not. Hence, to the extent Grace's motion for summary judgment fails, Hatco's motion will necessarily succeed.

■ As discussed above, for the Sale Agreement to have effected a release by Hatco of any CERCLA claim it might ever have against Grace, it must contain either a broad, all-inclusive waiver by Hatco of any and all claims it might ever have against Grace arising from the sale, or it must contain a specific provision that expressly or by clear implication waives any claim it might ever have against Grace arising from environmental problems at the Fords facility. The Sale Agreement contains neither type of provision.

The Sale Agreement clearly lacks a broad waiver and release from all liabilities. Assumed liabilities are carefully enumerated in section 1.11 of the Sale Agreement. More important, section 2.02 expressly declares that Hatco will not be responsible for any liability or obligation not included in the definition at section 1.11, and that "All such liabilities and obligations not assumed by [Hatco] are hereby retained by [Grace]." Thus, far from including a broad, all-inclusive waiver of any and all liabilities, the Sale Agreement actually contains express declarations to the contrary.

Grace's reliance on *Purolator* is misplaced. In that case the court found that a purchaser of assets had released the seller from CERCLA liabilities because in two separate agreements related to the transfer of certain assets, the parties included language under which the purchaser broadly assumed, without limitation, any and all liabilities related to or arising from the transferred assets. The 1975 agreement provided:

> Facet hereby assumes and agrees to satisfy all liabilities and obligations of Bendix, secured or unsecured (whether accrued, absolute, contingent or otherwise) relating to or arising out of the Assets (which are transferred hereby subject to such liabilities and obligations).

*Purolator,* 772 F.Supp. at 131. The 1979 agreement included equally broad language. *Id.* Moreover, quite unlike the agreement here, the indemnity provision in the 1979 agreement in *Purolator* did not restrict the liabilities assumed to those expressly specified, but rather stated broadly that the 1975 agreement "include[d], *but without limiting the generality thereof,*

---

that, at least in the context of an agreement negotiated at arms-length between sufficiently sophisticated parties, such a broad waiver of all liabilities will be sufficient to shift the risk of loss for CERCLA liabilities.

an assumption by Facet of, and an indemnity to Bendix and Fram against, *any and all liabilities* arising out of or connected with the assets and businesses" that were transferred. *Id.* (emphasis in original). Equally broad language was included in other parts of the agreement. *Id.* Thus, the court found a clear intent on the part of the parties to have the purchaser broadly assume all liabilities, including future CERCLA liabilities. The agreements in *Purolator* are so unlike the Sale Agreement here that *Purolator* provides no support for Grace's position.[9]

■ Grace argues that section 1.11(b)(iv) evinces a clear intent by the parties to have Hatco assume all environmental-type liabilities that might arise at the Fords facility. That section provides for the assumption by Hatco of *"other liabilities* and obligations arising in the ordinary course of the Chemical Business, whether prior to or after the date of the Closing, other than Excluded Liabilities." (Emphasis added). Grace contends that environmental cleanup liabilities arise "in the ordinary course" of Hatco's operations, and are therefore covered by subsection (iv). It further argues that the express inclusion of one environmental liability—for Sling Tail Brook pollution—in a schedule of specific "Excluded Liabilities" that complemented the general classes of Excluded Liabilities included in section 1.10 indicates a clear intent on the part of the parties that Hatco assume all other environmental liabilities under the ordinary course clause.

An identical "ordinary course" provision in an agreement between Grace and another party was construed by the Second Circuit Court of Appeals, in a different factual context, in *Haynes v. Kleinwefers and Lembo Corp.*, 921 F.2d 453 (2d Cir.1990). In *Haynes*, Grace argued that a liability arising after a sale of assets, from an injury sustained by an employee operating a machine that had been altered when it was owned by Grace, was assumed by the purchaser of assets under an "ordinary course of business" provision identical in all material respects to the one included in the Sale Agreement. 921 F.2d at 457. The Second Circuit, construing the subsection in the context of the whole section, rejected Grace's argument.

Applying ordinary rules of contract construction, it found that the reference to "other" liabilities and obligations in the "ordinary course" provision limited those liabilities and obligations to those "of like kind" to those mentioned in preceding subsections of the definition of "Assumed Liabilities and Obligations". *Id.* The preceding subsections in the agreement in *Haynes*, like those involved here, referred to accepted sales orders, ordered goods and services, and capital expenditures. *Id.* The Second Circuit found no additional language in the remainder of the agreement from which, together with the ordinary course clause, it could be clearly implied that the purchaser assumed liability for personal injuries that resulted from acts by Grace. Thus, the Second Circuit held that the "other" liabilities and obligations referred to in the "ordinary course" provision included only liabilities and obligations related to "business transactions" and did not broadly include any liability or obligation that arose during ownership of the

---

9. Grace's reliance on *Armotek Industries, Inc. v. Freedman,* 790 F.Supp. 383 (D.Conn.1992) is similarly misplaced. Grace reads *Armotek* as finding a broad assumption of environmental liabilities from the presence of contract language limiting the time period in which claims could be asserted based on a breach of any of the warranties or representations in the sale agreement. The contract barred the assertion of such claims after three years from the date of sale. The contract provision on which the action was based was one in which the seller represented that it was in compliance with all environmental laws on the date of the sale. The *Armotek* court found that the purchaser could

not recover any damages resulting from a condition that was in violation of environmental laws at the date of closing, because the action was brought after three years. It held that regardless of the legal theory for recovery, whether state statutory law, common law or CERCLA, the claim was barred because the agreement was unambiguous, and the claim asserted was based on a condition that was in violation of a Connecticut environmental law at the time of closing, and hence, in violation of the representation. *Armotek* is based on circumstances and an agreement very different in structure from that involved here. The Court therefore finds *Armotek* inapposite.

assets. *Id.* More important, however, the Second Circuit held that "a catch-all phrase such as 'other obligations and liabilities arising in the ordinary course of business' fails to establish clearly an unmistakable intent to assume an obligation to indemnify." *Id.* at 458. This Court agrees.

■ Grace has attempted to distinguish the Sale Agreement from the agreement in *Haynes* by arguing that the express retention by Grace in the schedule to section 1.10 of its liability for the alleged pollution of Sling Tail Brook makes clear that the parties thought about potential environmental liabilities, and expressly allocated their risk. This differs from the agreement in *Haynes*, it argues, because no mention of liability for personal injuries was made in that agreement. It contends that from the express retention by Grace of the liability for its pollution of Sling Tail Brook, together with the "ordinary course" provision, it can clearly be implied that Hatco assumed all other environmental-type liabilities. This argument is based on the canon of construction that the inclusion of one thing implies the exclusion of all others.[10]

The Court cannot accept Grace's argument, and finds that the mention of one environmental liability in the schedule to section 1.10 of the Sale Agreement does not modify the meaning of the "ordinary course" clause of the Sale Agreement. That provision remains constricted in scope, as the Second Circuit found in *Haynes*, by the liabilities and obligations expressed in other subsections of section 1.11. Grace's argument to the contrary reads too much significance into the inclusion of the phrase "other than Excluded Liabilities" in the ordinary course provision. That phrase—"other than Excluded Liabilities"—is included in each subsection of section 1.11. Inclusion of one item in the definition of "Excluded Liabilities" does not, without more, mean that every

other liability of a similar nature was assumed by Hatco. It is clear from the structure of section 1.10 that when the parties meant to exclude a broad class of liabilities, they did so expressly. They did not do so with respect to environmental liabilities.

■■ Moreover, the express retention by Grace of one specified pollution liability cannot alone shift responsibility for all other environmental liabilities to Hatco. To imply such a meaning would too easily relieve Grace of the burden, as a party seeking to impose on another a *duty to* indemnify it against the consequences of its own acts, to ensure that such an intent is clearly intended and expressed. Grace's express *retention* of one liability says nothing about the scope of liabilities Hatco *assumed;* it does not clearly imply that Hatco assumed all other similar liabilities, particularly when the Sale Agreement provides expressly to the contrary in section 2.02. Grace's reliance on the *expressio unius* doctrine is misguided. That doctrine "is not of universal application and caution should be exercised in its use." *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 667 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). When the controlling substantive law, as with the law of indemnity, requires a greater clarity of expression of contractual intent than is usually required in contracts, even more caution than is ordinarily the case should be applied in the use of the *expressio unius* rule of construction.[11] Thus, regardless of the inclusion of the Sling Tail Brook liability in the schedule to section 1.10, "a catch-all phrase such as 'other obligations and liabilities arising in the ordinary course of business' fails to establish clearly an unmistakable intent to assume an obligation to indemnify." *Haynes*, 921 F.2d at 458.

---

10. *"Expressio unius est exclusio alterius"*.

11. The Court notes that its and the *Haynes* court's application of the canon of construction *ejusdem generis* to limit the scope of liabilities of "other liabilities and obligations" is not in-

consistent with its rejection of the use of *expressio unius*, because *ejusdem generis*, unlike *expressio unius*, is consistent with and furthers the purpose of the substantive law to construe indemnity provisions narrowly.

At best, Grace's express retention of one environmental liability ambiguously expresses the intent Grace claims. Hatco's assertion that the Sling Tail Brook liability was expressly retained by Grace because it was the only environmental liability of which the parties were actually aware is at least as plausible an explanation as the one set forth by Grace. Given the ambiguity, the *Mobay* standard has not been met.

■ Even giving Grace the benefit of its construction of the "ordinary course" provision—that environmental liabilities are "ordinary course" liabilities within the meaning of the Sale Agreement—it would still fail to effect a wholesale assumption of environmental-type liabilities because the only "ordinary course" liabilities assumed are those of the "Chemical Business". "Chemical Business" is defined in the Sale Agreement as "that business *presently conducted* by Chemical...." Thus, Hatco argues, and the Court agrees, that because most of the liabilities in issue in this case are attributable to manufacturing activities that were not "presently conducted" at the time of the sale in 1978, even accepting Grace's construction of the ordinary course clause, those liabilities would not have been assumed. Grace counters that the "presently conducted" language is surplusage and should be ignored. Although Grace supports this argument by pointing out the absurdity of recognizing the "presently conducted" language in other contexts in the Sale Agreement, the language does not lead to an absurd result in the context in issue. Grace's arguments at best lead to the conclusion that the meaning of "Chemical Business" is ambiguous, which is further reason why the "ordinary course" clause should not be construed to effect a broad assumption of liability by Hatco.

■ Grace asserts another argument based on the drafting history of the Sale Agreement. Although, as discussed above, extrinsic evidence is irrelevant to the issue whether environmental liabilities have been assumed, the Court will nevertheless briefly address Grace's argument. Grace contends that during the negotiations of the Sale Agreement, Hatco attempted on more than one occasion to include in the agreement a provision by which Grace expressly retained all environmental liabilities. It further claims that it rejected the inclusion of such language every time it was suggested by Hatco. From this, together with its express retention of the Sling Tail Brook liability, Grace contends that the parties must therefore have believed that all other environmental liabilities were assumed by Hatco. This argument, like the previous argument based on the *expressio unius* maxim, improperly seeks to reverse the burden of expression of intent.

For an agreement to indemnify against CERCLA liabilities, an intent to that affect must be clearly expressed. This rule is simple: No clear expression, no indemnity. Grace's argument seeks to turn this rule on its head by imposing the opposite requirement that, unless *it* expressly agreed not to be indemnified for all of its environmental liabilities, Hatco must indemnify it for those liabilities. Grace seems to forget that the CERCLA liabilities in issue were *its* liabilities to begin with. If the parties failed to agree to expressly allocate the risk of loss for all of Grace's environmental liabilities, the burden of that failure must fall on Grace. Hence, Grace's refusal during the drafting of the Sale Agreement to expressly acknowledge its retention of all environmental liabilities in that document was an act without legal significance, notwithstanding its express retention of one specific environmental liability.

■ Grace additionally argues that another provision in the definition of assumed liabilities acts as an assumption by Hatco of all environmental-type liabilities. It argues that the assumption of

> other liabilities and obligations of which Alex Kaufman or David G. Seabrook has actual present personal knowledge and awareness at the date of this agreement, other than Excluded Liabilities

in section 1.11(b)(v) includes CERCLA liabilities.

Kaufman had worked at the Fords Hatco site for over twenty years, both for Grace and its predecessor. Kaufman was Presi-

dent of Grace's Hatco group from 1962 until the sale in 1978. Seabrook was a financial analyst for the Hatco Chemical Division, who negotiated for Kaufman the purchase of Hatco from Grace.

Grace argues that Kaufman's or Seabrook's knowledge of the existence of chemical pollution on the Fords site at the time of the sale was equivalent to knowledge of future environmental-type liabilities, and that therefore any CERCLA claim arising from pollution at the Fords facility of which Kaufman or Seabrook was aware has been assumed by Hatco. This argument fails for several reasons.

First, the reasoning of the Second Circuit in *Haynes,* found persuasive by the Court, that the general term *"other* liabilities and obligations" in the "ordinary course" provision was limited by the class of liabilities enumerated in previous subsections of section 1.11, applies equally well to this provision. Thus, the provision is similarly narrow, and applies only to liabilities and obligations "of like kind" to those enumerated before it in section 1.11(b).

Second, and perhaps more important, section 1.11(b)(v) by its express terms applies only to liabilities known to Alex Kaufman or David G. Seabrook "at the date of th[e] agreement". Grace's argument that its CERCLA liability "arose long before CERCLA was enacted", and could be "known" two years before the passage of CERCLA, is completely unpersuasive.[12] Grace relies almost exclusively on the definition of "liability" in *Black's Law Dictionary* to support its position. Although that expansive definition could be read to support Grace's position, the Court finds that the structure of the Sale Agreement and common sense militate sharply against Grace's position.

The structure of the Sale Agreement militates against Grace's position because its interpretation of "existing" liabilities, if accepted, would be read out of the Sale Agreement the distinction clearly made by the parties between liabilities "existing" on the date of closing and "liabilities arising ... after the date of the Closing", a distinction expressly made in the agreement. Compare Sale Agreement § 1.11(b)(v) with § 1.11(b)(iv). Common sense also defeats Grace's position because the term "liability" necessarily implies a legal relationship between the liable party and the party to whom it is liable. No such legal relationship existed, in the case of CERCLA liabilities, until enactment of CERCLA. *See In re Penn. Central Transportation Co.,* 944 F.2d 164, 167–68 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). What Grace essentially argues is that knowledge of all of the *facts* necessary for CERCLA liability at the date of closing is sufficient to constitute knowledge of "liabilities." Without a statutory or common law basis to impose responsibility, however, it is too far of a stretch to characterize the existence of the facts as a "liability." In an analogous situation, the Third Circuit found that a final decree in bankruptcy entered in 1978 that precluded future lawsuits against a reorganized debtor "on account of or based upon any right, claim or interest of any kind or nature whatsoever" did not bar future suits based on CERCLA. *In re Penn. Central,* 944 F.2d at 167–68. The court found that the nonexistence of that statute at the time of the decree meant that the petitioners did not have *any* interest, contingent or otherwise, that fell within the terms of the decree. *Id.* However broad Grace believes *Black's Law Dictionary* defines "liability", it is not any broader than the "right, claim or interest of any kind or nature whatsoever" in the decree in *In re Penn. Central.* Accordingly, it cannot be said that CERCLA liabilities existed at the date of closing of the Sale Agreement. Hence, section 1.11(b)(v) does not support Grace's contention that Hatco assumed CERCLA liabilities from Grace.

Therefore, the Court concludes, as a matter of law, that Hatco did not, through the

---

**12.** Thus, the issue whether extrinsic evidence could be considered to determine the scope of Kaufman's or Seabrook's knowledge to determine the breadth of indemnity need not be reached. The liabilities in issue *could not have been known* to Kaufman or Seabrook at the date of closing.

Sale Agreement, assume and agree to indemnify Grace for CERCLA liabilities. Grace's motion for summary judgement on this issue will therefore be denied, and Hatco's motion for summary judgment will be granted.

### III. Grace's Motion for Summary Judgment on Hatco's Common Law Strict Liability Claim

■ Hatco has asserted a claim in strict liability against Grace based on the allegedly abnormally dangerous activities in engaged in, involving the disposal of toxic wastes at the Fords site, while it owned that site. See generally *T & E Industries, Inc. v. Safety Light Corp.*, 123 N.J. 371, 587 A.2d 1249 (1991); *State Department of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150 (1983). Grace contends that Hatco assumed the risk of the abnormally dangerous conditions for which Hatco seeks recovery and that Hatco's strict liability claim is time-barred. Because the Court concludes that summary judgment should be granted in Grace's favor on the statute of limitations ground, it will not address the issue of assumption of risk.

Under N.J.S.A. § 2A:14–1, a claim for strict liability based on injury to real property must be commenced within six years from the date it accrues. New Jersey has embraced the "discovery rule", which tolls the running of the limitation of actions period until a person " 'learns, or reasonably should learn, the existence of that *state of facts* which may equate in law with a cause of action.' " *Apgar v. Lederle Laboratories*, 123 N.J. 450, 455, 588 A.2d 380 (1991) (quoting *Burd v. New Jersey Telephone Co.*, 76 N.J. 284, 291, 386 A.2d 1310 (1978)) (emphasis in original); *see also Allied Corp. v. Frola*, 730 F.Supp. 626, 631 (D.N.J.1990). The doctrine focuses on " 'material facts' relating to the existence and origin of [the] injury rather than the comprehension of the legal significance of such facts." *Lynch v. Rubacky*, 85 N.J. 65, 73, 424 A.2d 1169 (1981).

Grace asserts that Hatco knew or should have known at least eight years before it filed this action that the Fords Hatco site was extensively polluted with hazardous substances, and that the pollution was due to Grace's acts while it owned the Hatco facility. Grace supports its position primarily through the notice given to Hatco by an Amended Administrative Order that was issued by the New Jersey Department of Environmental Protection ("NJDEP") on December 14, 1981. (JA 212) The Amended Order documents a series of inspections by the agency to the Fords site. It also contains findings made based on the inspections, and on test results obtained from samples collected during the inspections. In addition, Grace has directed the Court's attention to several documents that indicate Hatco's knowledge that the pollution problems revealed by the NJDEP were caused by Grace. (JA 210, 211)

Test results on samples obtained during a February 18, 1981 inspection revealed that "extensive groundwater contamination is taking place at the Hatco site." (¶ 7, JA 212) Test results on samples obtained during a July 22, 1981 inspection revealed the presence on the site of "high concentrations of napthelene, phthalates, and petroleum hydrocarbons." (¶ 9, JA 212) The Amended Order included a directive that Hatco must "obtain NJDEP's approval of a plan for performing soil borings and installing monitoring wells to determine the extent discharges have contaminated groundwater beneath the Hatco site", and that Hatco must carry out that plan. (JA 212) Thus, Grace asserts that Hatco "knew or should have known" no later than December 1981 of facts sufficient to support a legal action based on strict liability, and that the six year statutory limitation of actions period ran out in December 1987, long before Hatco filed this action in 1989.

Hatco contends that it did not become aware of the extensive nature of the environmental problems at the site until it undertook a comprehensive study of the entire site between 1986 and 1988. Although that may be true, the Court concludes as a matter of law that the December 14, 1981 Amended Order put Hatco on notice of facts sufficient to trigger the running of the statute of limitations as to the prob-

lems directly addressed. As to every substance identified by the NJDEP to be present at a specific location on the Fords site, Hatco acquired direct and express notice. Claims based on those problems are therefore time-barred.

To the extent the Amended Order did not address specifically every problem that has since been discovered at the site, it nonetheless triggered a duty on Hatco's part to "exercise ... reasonable diligence and intelligence" to investigate and discover those problems. *Vispisiano v. Ashland Chemical Co.*, 107 N.J. 416, 419, 527 A.2d 66 (1987). This duty of reasonable inquiry arose despite Hatco's assertion that it disputed the NJDEP's findings.

The "discovery rule" is an equitable doctrine, *O'Keeffe v. Snyder*, 83 N.J. 478, 491, 416 A.2d 862 (1980), that requires diligence and reasonable investigative efforts on the part of the plaintiff, *id.* at 497–98, 416 A.2d 862. "In determining whether the discovery rule should apply, a court should identify, evaluate and weigh the equitable claims of all parties." *Id.* at 498, 416 A.2d 862. Under the circumstances presented in this case, the equities weigh heavily against Hatco.

Hatco's owner, Alex Kaufman, worked at the Fords site for more than twenty years, including a substantial period of time as President. In the Sale Agreement, he acknowledged that he was "personally familiar with the business and operations of [the Fords facility]" prior to the sale. Sale Agreement § 8.01 (JA 187). Thus, when Hatco received the Amended Order, it was not as if it had for the first time been made aware that substantial polluting activities had occurred on the site. Indeed, the Amended Order indicated that releases of pollutants were ongoing. As noted above, the statute is triggered by a

plaintiff's knowledge of "material facts", not by conclusive proof of every relevant fact. Thus, Hatco's argument that it did not learn of its claim until it undertook an extensive engineering survey rings hollow. Because of Kaufman's intimate familiarity with the day-to-day operations of the site developed over two decades, and its ongoing water and air pollution problems, Hatco was in a position to with reasonable promptness verify the extent of pollution at the site. Against the backdrop of Kaufman's extensive knowledge of waste disposal practices at the site, Hatco cannot now invoke as a shield against application of the statute of limitations its own inaction in waiting close to five years to investigate the problems raised by the 1981 NJDEP order. Therefore, as to problems not specifically addressed in the Amended Order, the Court finds that the NJDEP order put Hatco on inquiry notice such that Hatco "should have" discovered their existence shortly thereafter, through the exercise of "reasonable diligence and intelligence". *Vispisiano*, 107 N.J. at 419, 527 A.2d 66. The Court finds as a matter of law that such diligence would have revealed facts sufficient to equate in law with Hatco's strict liability claim more than six years before Hatco filed this action in 1989. Accordingly, the Court concludes that Hatco's strict liability claim is time-barred by the six-year statute of limitations in N.J.S.A. 2A:14–1.[13]

## IV. *Hatco's Motion to Strike Grace's Defenses to CERCLA Liability*

Hatco has moved to strike certain defenses from Grace's Answer to Plaintiff's Second Amended Complaint ("answer"). For the reasons that follow, the motion will be granted in part, and certain defenses enumerated below will be stricken.

**13.** Hatco's further argument that its claims constitute "continuing torts" for which the statute of limitations has tolled misconstrues that doctrine. The "continuing tort" doctrine has never been applied to a case like this, but has been restricted to claims of professional and medical malpractice where continuing negligent services have been provided to the plaintiff. *See Erlich v. First Nat'l Bank of Princeton*, 208 N.J.Super.

264, 299, 505 A.2d 220 (Law Div.1984). Further, it is limited to circumstances in which the negligent acts are continuous, not where, like in this case, the negligent acts were discrete, but damage is continuous. *Diamond v. New Jersey Bell Telephone Co.*, 97 N.J.Super. 1, 3, 234 A.2d 96 (App.Div.1967), *rev'd on other grounds*, 51 N.J. 594, 242 A.2d 622 (1968).

In its answer to Hatco's Second Amended Complaint ("complaint"), Grace has asserted 26 affirmative defenses to liability. Hatco's complaint includes state law counts in addition to a count based on CERCLA. Grace has not specified in its answer the counts to which each affirmative defense is being raised. In this motion, Hatco seeks to have all of those defenses not based on the 1978 Sale Agreement between Hatco and Grace stricken, to the extent they are raised as to the CERCLA count, on the ground that they are insufficient as a matter of law.

Grace has represented in its Memorandum in Opposition to Hatco's motion at footnote 24 that it will not pursue three of the defenses to the CERCLA claim. These defenses include one based on the statute of limitations, and two based on constitutional challenges to CERCLA. Accordingly, those defenses, asserted in ¶¶ 75, 82 and 95 of the answer, need not be discussed, and will be stricken by the Court. The Court will also strike the defense of failure to join indispensable parties, asserted in ¶ 96 of the answer, as inconsistent with the Court's Order dated July 11, 1989.

### A. Equitable and State–Law Defenses

■ Hatco first argues that 16 equitable and state-law defenses pleaded by Grace are precluded from being raised as defenses to CERCLA liability by 42 U.S.C. § 9607.[14] That section provides for liability

[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this subsection.

Subsection (b) provides:

There shall be no liability under subsection (a) of this section for a person who can establish by a preponderance of the evidence that the release or threat of a release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of relevant facts and circumstances, and (b) he took all precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b).

In *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988), the Third Circuit held that *caveat emptor* and unclean hands could not be asserted as defenses to CERCLA liability because such defenses "do not comport with congressional objectives." *Id.* at 90. The court observed that in legislative history, Congress made clear that " 'the only defenses to liability remain those set forth in Section [9607(b) ].' " *Id.* (quoting H.R.Rep. No. 253(I), reprinted in 1986 U.S.Code Cong. & Admin.News at 2861–62). In addition to being expressly acknowledged in the legislative history, the exclusivity of the defenses in § 9607(b) is apparent from the language of the statute itself. The Court therefore held that, although equitable considerations may be raised in mitigation of the amount of a damage award, they may not be raised as defenses to liability. *Id.* Other courts have similarly concluded that the defenses provided in CERCLA are exclusive. *See, e.g., General Electric Co. v. Litton Industrial Automation Systems,*

---

**14.** Those 16 defenses are: estoppel, ¶ 76; laches, ¶ 77; waiver, ¶ 78; unclean hands, ¶ 79; *caveat emptor,* ¶ 80; offset, ¶ 81; good faith, ¶ 85; governmental compulsion, ¶ 86; third-party causation, ¶ 87; absence of abnormally hazardous or dangerous activity, ¶ 88; contributory negligence, ¶ 89; comparative negligence, ¶ 90; assumption of risk, ¶ 91; secondary or passive liability, ¶ 92; failure to mitigate damages, ¶ 97; and lack of causation, ¶ 99.

*Inc.*, 920 F.2d 1415, 1418 (8th Cir.1990) ("CERCLA is a strict liability statute, with only a limited number of statutorily-defined defenses available"), *cert. denied*, —— U.S. ——, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991); *United States v. Kramer*, 757 F.Supp. 397, 428 (D.N.J.1991).

Grace has responded to Hatco's motion by citing decisions that are not binding on this Court and are otherwise unpersuasive. *Smith Land* and the statute itself are clear: no defense not provided by CERCLA itself may be raised as a bar to CERCLA liability. With the exception of the defense asserted in paragraph 99, the Court finds that this rule should be applied to all defenses listed in footnote fourteen. The causation defense asserted in paragraph 99 falls within the ambit of the "divisibility of harm"/causation defense recognized by the Third Circuit in *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir.1992), discussed below, and will therefore not be stricken. As to the other defenses, although Grace may raise and prove equitable considerations in mitigation of damages in the context of the allocation of joint and several liability between responsible parties in a contribution claim under § 9613(f), those considerations have no place in the answer as defenses to CERCLA liability. *Kramer*, 757 F.Supp. at 428. Accordingly, the defenses listed in footnote 14 of this Opinion, with the exception of the Twenty–Sixth Defense asserted in paragraph 99, will be stricken to the extent that they are asserted against Hatco's CERCLA claim.

**B. CERCLA Defenses**

Hatco has also moved to dismiss the defenses asserted in paragraphs 94 and 98 of Grace's answer. Paragraph 94 contains the allegation that "Any costs incurred by Hatco were neither necessary nor consistent with the National Contingency Plan, as required under Section 107 of CERCLA, 42 U.S.C. § 9607." Paragraph 98 contains the allegation that

> Grace is not liable for any release or threatened release of hazardous substances alleged by Hatco in the Complaint, and any costs or damages resulting therefrom, caused solely by the acts or omissions of third parties other than employees or agents of Grace persons whose acts or omissions occurred in connection with a contractual relationship, existing directly or indirectly, with Grace, because all of its actions in relation to the Fords facility or to the hazardous substances alleged to have been released or threatened to be released from the site, Grace exercised due care, taking into consideration the characteristics of such hazardous substance [sic], in light of all relevant facts and circumstances, and Grace also took all precautions against foreseeable result [sic] from such acts or omissions.

The first defense is superfluous and will be stricken. The second defense is facially proper, and will not be stricken from Grace's answer.

Hatco argues that proof of the necessity of response costs and their consistency with the national contingency plan is not required to establish CERCLA liability, citing *T & E Industries, Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 708 (D.N.J.1988), and *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989). And that, therefore, a defense based on the absence of such proofs is insufficient as a matter of law. *T & E* held that CERCLA liability could be established without proof of necessity and consistency with the NCP of the response costs. *Id.* 680 F.Supp. at 709. *Liability* under CERCLA can be established by proof that the plaintiff incurred "response costs". Proof that those response costs were necessary and consistent with the National Contingency Plan ("NCP") is required only to prove the extent of plaintiff's recovery. 42 U.S.C. § 9607(a)(4)(B). Therefore, a defense that no proper response costs have been incurred is essentially a defense that plaintiff has not been damaged within the meaning of CERCLA. As plaintiff already bears the burden to establish the extent of its damages, this defense is superfluous and will be stricken.

The other CERCLA defense raised by Grace derives from § 9607(b)(3), set forth at length above. Hatco contends that this defense should be stricken because "Grace cannot claim that the releases or threatened releases of the hazardous substances listed in Hatco's complaint were caused *solely* by third parties." Hatco Memorandum Concerning Defenses Not Based on 1978 Agreement of Sale at 14. Hatco's position therefore is not that the defense is insufficient as a matter of law, but that Grace cannot prove that *any* release or threatened release of hazardous substances at the Fords facility falls within the defense. Striking a clearly permissible defense on the ground that it is not factually supported would be inappropriate. *See Kramer*, 757 F.Supp. at 410 (a court "may strike only those defenses so legally insufficient that it is beyond cavil that defendants cannot prevail upon them"). The Court cannot say with any confidence that there is no way Grace can prevail on this defense as to any release or threatened release of a hazardous substance at the Fords facility, and will therefore deny Hatco's request to strike it from the answer.

### C. Failure to State A Claim

Hatco further has moved to strike the defense asserted in paragraph 74 of Grace's answer to the extent it is raised as to the CERCLA claim, that "Hatco has failed to state a claim against Grace upon which relief can be granted." Grace has not with any specificity opposed this request. The Court finds that Hatco's complaint adequately asserts all of the elements of a CERCLA claim. Accordingly, the defense raised in paragraph 74 of Grace's answer will be stricken to the extent that it is asserted against Hatco's CERCLA claim.

### D. Conclusion

For the reasons stated above, Hatco's motion to strike certain defenses from Grace's answer will be granted in part, and the Court will strike the defenses raised in paragraphs 74 through 82, 85 through 92, and 94 through 97, to the extent that they are asserted against Hatco's CERCLA claim.

### V. *Hatco's Motion for Partial Summary Judgment On the Issue of CERCLA Liability and Grace's Cross–Motion On the Issue of Contribution Liability*

Hatco has moved for a partial summary judgment on the issue of Grace's liability under CERCLA. It seeks a judgment that Grace is liable to it under CERCLA for $707,804.82 in response costs already incurred to investigate the conditions at the Fords site. Hatco further seeks a declaration that Grace is liable for all future response costs incurred to investigate, remove and remediate hazardous substances released by Grace at that site. For the reasons that follow, the Court will deny Hatco's motion.

Grace has cross-moved for a declaration that, in the event the Court grants Hatco's motion, Hatco is liable for contribution to Grace for any CERCLA response costs that may equitably be apportioned to it. Because the Court will deny Hatco's motion, Grace's motion need not be reached.

Section 107(a) of CERCLA provides, in relevant part, that

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> \* \* \* \* \* \*
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ...
>
> \* \* \* \* \* \*
>
> from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
> \* \* \* \* \* \*
>
> (B) any ... necessary costs of response incurred by any ... person consistent with the national contingency plan.

42 U.S.C. § 9607(a). Thus, four elements must be proved by Hatco to establish

Grace's liability under CERCLA: (1) that the Hatco property is a "facility"; (2) that a "release" or "threatened release" of a hazardous substance from the Hatco property has occurred; (3) that a release or threatened release of hazardous substances has caused Hatco to incur "response costs"; and (4) that Grace "owned or operated" the Hatco facility at the time that any hazardous substances were disposed of on that site. *T & E Industries,* 680 F.Supp. at 708. If these four elements are established as undisputed, summary judgment on the issue of liability is appropriate. *Id.*

Grace admitted in its answer that it both "owned and operated" the Fords site between 1959 and August 1978. Answer at ¶ 6 (JA 438). That the Fords site was a "facility" is beyond dispute. "Facility" is very broadly defined to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). Ample documentation has been submitted by Hatco that "hazardous substances" had "come to be located" and disposed of at the site while Grace was its owner and operator.[15] *See, e.g.,* Pond Soil Summary at DR700449–53 (JA 488) (indicating presence of polychlorinated biphenyls ("PCBs") in "settling ponds" in concentrations up to 3200 parts per million ("ppm") and presence of various phthalates in the ponds and muck storage areas in concentrations up to 34,000 ppm); Daners Memorandum dated June 24, 1970 (JA 130) (indicating discharge of millions of pounds of phthalic anhydride, esters and other compounds per year into the pond and lagoon areas); Dominach Memo. (JA 129) (same); Morano Memo. (JA 128) (same); Table II: Summary of Targeted Volatile Organic Compounds in Ground Water at 700368–70 (JA 489) (indicating groundwater contamination by hazardous substances); Napthelene Residue Report at H014040–54 (JA 408) (indicating concentrations of napthelene in the napthelene waste disposal area of the site). Thus, the first and

fourth elements of CERCLA liability have been established.

The second element is also beyond dispute. "Release" is defined, in relevant part, as

> any spilling, leaking, pumping, pouring, emitting, discharging, injecting, escaping, leaching, dumping, or disposing into the environment. . . .

42 U.S.C. § 9601(22). This definition has been read broadly. *See Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 793 (D.N.J.1989). Thus, the extensive documentation of pollution offered to establish that the Fords site is a "facility" also establishes that hazardous substances have been "released" onto that site.

Grace maintains, however, that material fact disputes exist as to the remaining element: that the releases of hazardous substances "cause[d] the incurrence of response costs". The Third Circuit Court of Appeals has held that response costs include costs for investigating, testing, sampling, and monitoring environmental contamination caused by the release of hazardous substances. *Artesian Water Co. v. New Castle County,* 851 F.2d 643, 651 (3d Cir.1988) (citing *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887 (9th Cir. 1986)); *see also Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1153 (9th Cir.1989); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir.1985) ("costs in assessing conditions of the site . . . fall squarely within CERCLA's definition of response costs"). It is undisputed that, between February 1986 and June 1990, Hatco incurred $707,804.82 in liability for fees to Dan Raviv Associates, Inc. ("Raviv"), consultants in hydrogeology, water quality and landfill hydrology. See Revised Summary of Raviv Invoices (JA 480); Raviv Invoices (JA 481). Of these invoices, it is undisputed that $668,975.43 was incurred to monitor, assess and evaluate the extent of hazardous substance contamina-

---

**15.** That the various substances found present at the site are "hazardous substances" is undisput-

ed. See 42 U.S.C. § 9601(14) and 40 C.F.R. 302.4 (1991).

tion at the Hatco site.[16] Hence, Hatco has established that it incurred response costs to the extent of $668,975.43.

Nevertheless, Grace maintains that a number of factual issues exist as to the extent to which the response costs already incurred or yet to be incurred are divisible between harm resulting from Grace's acts and harm resulting from Hatco's acts. Grace asserts and has submitted evidence that Hatco has also contributed to the environmental problems at the site in the thirteen years since it has owned that site, either through its own discharges or through its inaction in cleaning up Grace's disposal of hazardous substances. It contends that some part of the response costs already incurred or that will in the future be incurred can be attributed to Hatco's acts, and that summary judgment on liability for all response costs is therefore inappropriate.

To the extent that Grace's opposition to Hatco's motion is premised on Hatco's inaction in cleaning up Grace's hazardous substance contamination, its argument might succeed. Merely because Hatco is liable, however, due to its passive inaction during its ownership of the site, for any continued releases of hazardous substances disposed of by Grace, *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845–46 (4th Cir.1992), does not relieve Grace from liability for such continued releases. Under § 9607(a), Grace is joint and severally liable for any and all releases of hazardous substances at the Fords facility, indefinitely into the future, provided that it owned or operated that facility when those substances were initially disposed of there. 42 U.S.C. § 9607(a)(2), (4). That Hatco may also be liable for the later migration of those substances while it owns the facility under § 9607(a)(1) does not automatically relieve Grace of any liability. As will be discussed below, Grace's liability for Hatco's inactions can be defeated only if it can sustain its burden to prove that the harm is divisible.

The extent to which any response costs incurred by Hatco were due to its own post-sale pollution, moreover, is, as Hatco has correctly argued, also largely irrelevant to Grace's liability for all response costs incurred to investigate and cleanup the site. CERCLA liability for all response costs caused by any release or threatened release is strict, and attaches to any owner or operator of a facility on which any hazardous substances have been disposed of: "it is the *release alone* that must justify the response costs, not the particular waste generated by one given defendant." *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 264 (3d Cir. 1992) (emphasis in original).

> The statute does not ... require the plaintiff to prove that the generator's *hazardous substances* themselves caused the release or caused the incurrence of response costs; rather, it requires the plaintiff to prove that the *release or threatened release* caused the incurrence of response costs, and that the defendant is a generator of hazardous substances at the facility.

*Id.* (emphasis in original). "Congress considered and rejected a requirement that the plaintiff establish that the defendant's waste caused or contributed to the release or the incurrence of response costs." *Id.* at 265. Thus, whether Hatco caused the need to incur any of the response costs is in itself immaterial to the issue of Grace's liability.

An exception to the CERCLA principles stated above, however, was recognized by the Third Circuit Court of Appeals in *Alcan Aluminum* when a defendant can prove the "divisibility" of harm caused by it. Recognizing the harshness of a rule that holds a party liable without regard to the extent to which it caused damage, the Third Circuit adopted the use of Section 433A of the *Restatement (Second) of Torts* in apportioning liability between joint tortfeasors. *Id.*, at 268–69. That section provides:

---

16. A factual dispute has been raised by Grace as to whether the remaining $38,829.43 in invoices consisted solely of fees properly categorized as "response costs".

(1) Damages for harm are to be apportioned among two or more causes where

 (a) there are distinct harms, or

 (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

*Id.* at 268. When a joint tortfeasor seeks to apportion harm—here Grace—"it is the tortfeasor's burden to establish that the damages are capable of such apportionment." *Id.*, at 269. This burden is "substantial". *Id.* Nevertheless, the "divisibility" inquiry is of an "intensely factual nature", militating against "summary judgment for the full claim in favor of [the plaintiff] without conducting a hearing." *Id.*

Grace has raised a number of factual issues as to the extent to which the Hatco has contributed to the contamination of the site in the thirteen years since it has owned the site, either through its own discharges or through its inaction in cleaning up Grace's disposal of hazardous substances. Grace therefore disputes that it is fully liable for all response costs incurred by Hatco. Under *Alcan Aluminum*, Grace is not liable for response costs incurred by Hatco that result from its own post-sale pollution or inaction and is divisible from harm occasioned by the disposal of hazardous substances during Grace's ownership of the site.

■■■ Hatco contends that Grace has failed to raise a material fact dispute as to Hatco's liability for any response costs incurred or that will be incurred at the Fords site. It has submitted an extensive exposition of the facts of record and an explanation of why it believes a sufficient issue has not been raised as to whether its response costs were expended due to its own releases of hazardous substances. See Reply Memorandum at 32–63. Although Hatco has extensively countered Grace's contentions that the need to incur response costs was due to any of Hatco's thirteen years of post-sale activities, inactions or releases, without rendering a point-by-point

analysis, the Court finds that material issues remain disputed on the divisibility of harm issue. Even though the amount of response costs attributable to Hatco may ultimately be found minimal, because Grace has raised factual issues, and in the absence of any undisputed segregable amount of response costs attributable solely to Grace, summary judgment is inappropriate.

■■■ Despite Hatco's further assertion that, at a minimum, the disposal of specific substances, such as PCBs, are 100% attributable to Grace, summary judgment is nevertheless inappropriate. Merely establishing that disposals of certain substances are solely attributable to Grace does not establish which releases, threatened releases or response costs are attributable to those disposals.

■■■ Hatco's argument that divisibility of harm is a question inappropriate for determination in a § 107(a) action, but should be considered in the context of a § 113(f)(1) action, was rejected by the Third Circuit in *Alcan Aluminum*. There, the court held that the divisibility of harm issue is directly relevant in a § 107(a) action because it deals with the defendant's "effort to avoid liability otherwise established." *Id.* at 269. It further observed that

the "contribution" inquiry involves an analysis similar to the "divisibility" inquiry, as both focus on what harm the defendant caused. However, we believe that this inquiry ... is best resolved at the initial liability phase and not at the contribution phase since *it involves precisely relative degrees of liability.* Thus, if the defendant can prove that the harm is divisible and that it only caused some portion of the injury, it should only be held liable for that amount.

\* \* \* \* \* \*

We note, of course, that a determination in a given case that harm is indivisible will *not* negate a defendant's right to seek contribution ..., as the contribution proceeding is an equitable one in which a court is permitted to allocate response

costs based on factors it deems appropriate, whereas the court is not vested with such discretion in the divisibility determination.

*Id.*, at 270 n. 29 (emphasis added).

Consequently, because the Court finds that Grace has raised sufficient fact questions as to the relative degrees of harm caused by Hatco, it should have the opportunity to prove at trial that those harms are divisible, and that Grace is therefore not liable for all response costs. Hatco's motion for summary judgment on the issue of CERCLA liability and response costs already incurred will therefore be denied. Because Grace made its motion for a declaration of liability for contribution contingent on the Court granting Hatco's motion, it need not be addressed.

VI. *Cross–Motions for Summary Judgment On the Issue Whether Hatco Failed to Comply With the National Contingency Plan*

Between 1961 and 1971, Grace generated close to 5,000 tons of phthalic anhydride ("PA") distillation residue as a by-product of its production of PA. This residue was deposited on a site that was 400 feet by 300 feet in area, which became known as the "PA Residue Area." Hatco has never manufactured PA. Between July 12 and August 18, 1988, approximately 18,000 cubic yards of soil weighing close to 25,000 tons was excavated from the PA Residue Area and shipped to a landfill at a cost in excess of five million dollars.

Grace and Hatco have cross-moved for summary judgment on the issue whether Hatco complied with the National Contingency Plan ("NCP") when it incurred cleanup costs by its excavation and disposal of soil from the PA Residue Area. Grace contends it is undisputed that Hatco failed to comply with the terms of the NCP in its cleanup of the PA area, and that Grace is therefore entitled as a matter of law to a judgment that Hatco may not recover *any* of the costs of that cleanup. Hatco, conversely, contends that it is undisputed that its cleanup was consistent with the NCP, and that it is therefore entitled as a matter

of law to a judgment for all cleanup costs incurred in August 1988. For the reasons that follow, the Court finds that disputed factual issues preclude the Court from granting either motion.

A. Hatco's Motion

■ Hatco's motion for summary judgment on its response costs to cleanup the PA residue area is contingent on its motion for summary judgment on the issue of Grace's liability under CERCLA. Hatco may not obtain a judgment for specific response costs unless it has already established Grace's liability under CERCLA. Because the Court has determined that Hatco's motion as to Grace's CERCLA liability must be denied, this motion must also fail. Material issues of fact remained disputed as to the divisibility of the harms caused by Grace's disposal of the PA residues and the harms caused by Hatco's ten years of inaction before excavating those materials, during which those residues may have migrated or otherwise caused further damage. Accordingly, Hatco's motion will be denied.

B. Grace's Motion

Grace contends that many aspects of Hatco's excavation of the PA residue area were neither necessary nor in compliance with the NCP. For response costs to be recoverable, they must have been both necessary and consistent with the NCP. 42 U.S.C. § 9607(a)(4)(B). Thus, Grace seeks a summary judgment that Hatco may not recover any of the costs incurred in connection with that cleanup.

■ Different standards apply to determine the consistency of Hatco's cleanup with the NCP depending on whether it was a "removal" or "remedial" action. "Removal action" and "remedial action" are defined respectively at 42 U.S.C. §§ 9601(23) and (24). In brief,

"removal" actions are primarily those intended for short-term or interim responses and "remedial" actions are generally considered long-term or permanent remedies.

*T & E Industries,* 680 F.Supp. at 706. More extensive requirements must be complied with for remedial actions, because their comprehensive, permanent nature usually means no further cleanup will occur.

 Hatco contends that its cleanup was a removal action. Grace contends that it was a remedial action. The parties make numerous factual and legal arguments in support of their positions. Because the Court finds that a substantial number of fact issues are disputed as to whether Hatco's cleanup was a removal or remedial action, it may not determine by summary judgment whether Hatco effected a removal or remedial action. Therefore, unless Grace can demonstrate beyond dispute that Hatco's actions were inconsistent with the NCP standards for removal actions, its motion must be denied.

 Critical to the determination whether actions taken are consistent with the NCP is the standard of compliance. The 1985 version of the NCP, which applies to Hatco's cleanup of the PA Residue Area, *see Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1575 (E.D.Pa.1988) (NCP in place at time of cleanup controls), was silent on the standard of compliance. Courts construing that NCP for the most part held that "strict compliance" with its terms was required. *See, e.g., Amland Properties,* 711 F.Supp. at 796–97.

The 1985 NCP was superseded by a newer NCP in 1990. In the Summary of the 1990 NCP, the EPA stated that

> Today's revisions to the NCP are intended to implement regulatory changes necessitated by SARA, *as well as to clarify existing NCP language* and to reorganize the NCP to coincide more accurately with the sequence of response actions.

55 Fed.Reg. 8666, March 8, 1990 (emphasis added). One provision of the 1990 NCP provides that:

> A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in *substantial compliance* with the applicable requirements ... and results in a CERCLA quality cleanup.

40 C.F.R. § 300.700(c)(3)(i) (1990), 55 Fed. Reg. 8858, March 8, 1990 (emphasis added). Hatco argues that the "substantial compliance" standard of the 1990 NCP was intended to *clarify* the 1985 NCP, and should therefore be applied to its actions. In support of this argument, it relies on *Versatile Metals,* in which the court held, referring to differences between the 1985 and 1990 NCPs, that "[t]o the extent that the subsequent regulations *clarify* the prior regulations as to private party obligations, such regulations will govern." 693 F.Supp. at 1575 (emphasis in original). More to the point, Hatco relies on the unpublished decision in *Con–Tech Sales Defined Benefit Trust v. Cockerham,* 1991 Westlaw 209791 (E.D.Pa. October 9, 1991), in which Judge Van Antwerpen found that

> the substantial compliance standard is meant to *clarify* the meaning of "consistent with the NCP," not to add a new provision. The "strict compliance" standard advocated by the defendants is a creation of the courts, not the EPA, and the agency has simply announced its disagreement with the courts' interpretation of section 107 of CERCLA and of the 1985 NCP.

Slip Op. at 6.

The Court fully agrees with this analysis. As the Third Circuit recently observed, "CERCLA is a remedial statute which should be construed liberally to effectuate its goals." *Alcan Aluminum,* 964 F.2d at 258. That compliance with the NCP must be "strict" is nowhere hinted at in CERCLA itself, nor is it expressed in the 1985 NCP. That standard is at odds with the goal of CERCLA to facilitate prompt cleanups of hazardous substances by assuring those who perform the cleanup that they may recover their costs from those who caused the need to incur them. The strict compliance standard would place too great of a risk on the party expending funds to cleanup a site that it would not recover its costs, and would thus discourage cleanups. It would also frustrate the congressional policy that those who cause the harm should pay for it. Thus, the Court finds

that the substantial compliance standard shall be applied to Hatco's actions.

■ The remaining factual questions, whether the response costs incurred by Hatco were necessary and in substantial compliance with the NCP, are hotly disputed by the parties, and the Court finds that none of them may be resolved on motion for summary judgment. Accordingly, Grace's motion will be denied.

VII. *Cross–Motions for Summary Judgment on the Issue Whether Attorney's Fees May Be Recovered Under CERCLA*

■ Hatco and Grace have cross-moved for summary judgment on the issue whether attorneys fees may be recovered under CERCLA. In *T & E Industries, Inc. v. Safety Light Corp.*, 680 F.Supp. 696 (D.N.J.1988), this Court held that such fees may not be recovered. *Id.* at 707–08. Plaintiff Hatco asks that the Court reconsider that holding in light of arguments based on legislative history not advanced by the parties in *T & E*, and also on the authority of the Eighth Circuit Court of Appeals in *General Electric Co. v. Litton Industrial Automation Systems, Inc.*, 920 F.2d 1415 (8th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991).

For the reasons stated in *T & E*, the Court adheres to its view that attorneys fees are not recoverable by a private party under CERCLA. An additional, more persuasive ground to disallow attorneys fees, not mentioned in *T & E*, is the United States Supreme Court's directive in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) that "absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation." *Id.* at 185, 96 S.Ct. at 2602. CERCLA was enacted against the backdrop of *Runyon*. Yet the statute contains nothing even remotely "explicit" that authorizes the recovery of attorneys fees by a private party. Under this standard, policy arguments why fees should be recoverable, and arguments based on legislative intent, advanced by Hatco, are irrelevant. The Court therefore finds plaintiff's arguments based on legislative history and policy concerns, and the Eighth Circuit of Appeals' reasoning in *Litton*, unpersuasive. Accordingly, the Court will deny Hatco's motion on the issue of attorneys fees, will grant Grace's motion for summary judgment on that issue, and will strike the demand in Hatco's complaint for recovery of attorneys fees under CERCLA.

CONCLUSION

For the reasons stated above, Hatco's motion for summary judgment that Grace's liabilities under CERCLA were not assumed by Hatco under the 1978 Sale Agreement will be granted. Grace's cross-motion on the same issue will be denied. Grace's motion for summary judgment in its favor on Hatco's claim under state common law for damage to property based on a theory of strict liability will be granted on the ground that Hatco's claims are time-barred by the statute of limitations. Hatco's motion to strike a number of defenses from Grace's Answer to the Second Amended Complaint to the extent they are asserted against Hatco's CERCLA claim will be granted as to paragraphs 74 through 82, 85 through 92, and 94 through 97 of the Answer, and otherwise denied. Hatco's motion for partial summary judgment against Grace on the issue of Grace's liability for all response costs under CERCLA will be denied. The parties' cross-motions for summary judgment on the issue whether response costs already incurred by Hatco to clean up one area of the site were incurred in compliance with the national contingency plan will both be denied. Last, Grace's motion for summary judgment that attorneys' fees are not recoverable by a private party in a response cost action under CERCLA will be granted, and Hatco's demand in Count I of its Second Amended Complaint for attorneys fees will be stricken. Hatco's cross-motion on the issue of attorneys fees will be denied.

ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 27th day of July, 1992,

ORDERED that defendant's motion for a declaration that plaintiff assumed defen-

dant's liabilities under CERCLA under the 1978 Sale Agreement is denied; and it is further

ORDERED that plaintiff's cross-motion for summary judgment declaring that defendant's liabilities under CERCLA were not assumed by plaintiff under the 1978 Sale Agreement is granted; and it is further

ORDERED that defendant's motion for summary judgment in its favor on Count II of plaintiff's Second Amended Complaint because plaintiff's claims are time-barred by the statute of limitations is granted; and it is further

ORDERED that plaintiff's motion to strike defenses from defendant's Answer to the Second Amended Complaint to the extent they are asserted against Count I of plaintiff's Second Amended Complaint is granted as to paragraphs 74 through 82, 85 through 92, and 94 through 97 of the Answer, and otherwise denied; and it is further

ORDERED that plaintiff's motion for partial summary judgment against defendant on the issue of defendant's liability for all response costs under CERCLA will be denied; and it is further

ORDERED that the cross-motions for summary judgment by plaintiff and defendant on the issue whether response costs already incurred by plaintiff to clean up one area of the site were incurred in compliance with the national contingency plan will both be denied; and it is further

ORDERED that defendant's motion for summary judgment that attorneys' fees are not recoverable by a private party in a response cost action under CERCLA will be granted, and the demand in Count I of plaintiff's Second Amended Complaint for attorneys fees will be stricken; and it is further

ORDERED that plaintiff's cross-motion on the issue of attorneys fees will be denied.